1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF TEXAS

3                     GALVESTON DIVISION


4
UNITED STATES OF AMERICA        §      CASE NO. 3:14-CR-12
5                               §      (Defendants 1 through 5)
VERSUS                          §
6                               §      GALVESTON, TEXAS
ABEL HINOJOSA (1)               §
7  NELSON AGAPITO VENTURE (2)    §      FRIDAY,
DANIEL REYES (3)                §      JULY 18, 2014
8  ISRAEL SANCHEZ (4)            §
RODOLFO HERNANDEZ PEREZ (5)     §      1:37 P.M. TO 3:55 P.M.
9

10                      DETENTION HEARING

11         BEFORE THE HONORABLE JOHN R. FROESCHNER
              UNITED STATES MAGISTRATE JUDGE
12
        APPEARANCES:            SEE NEXT PAGE
13      CASE MANAGER:           SHEILA ANDERSON
        COURT RECORDER:         CATHY CARNEW
14

15      THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE
        UNDER THE CRIMINAL JUSTICE ACT AND MAY BE USED ONLY AS
16      AUTHORIZED BY COURT ORDER.  UNAUTHORIZED REPRODUCTION
        WILL RESULT IN AN ASSESSMENT AGAINST COUNSEL FOR THE
17      COST OF AN ORIGINAL AND ONE COPY AT THE OFFICIAL RATE.
        General Order 94-15, United States Court, Southern
18      District of Texas.

19

20                  TRANSCRIPTION SERVICE BY:

21           JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                935 ELDRIDGE ROAD, #144
22                SUGAR LAND, TEXAS 77478
           Tel: 281-277-5325 / Fax: 281-277-0946
23              www.judicialtranscribers.com

24

25      Proceedings recorded by electronic sound recording;
           transcript produced by transcription service.

```
 1    APPEARANCES:

 2

 3    FOR THE GOVERNMENT:              SHARAD S. KHANDELWAL, ESQ.
                                       US Attorney's Office
 4                                     Southern District of Texas
                                       1000 Louisiana, Suite 2300
 5                                     Houston, TX 77002

 6    FOR THE DEFENDANT,
      ABEL HINOJOSA (1):              JARED S. ROBINSON, ESQ.
 7                                    1100 ROSENBERG AVE.
                                      GALVESTON, TX  77551
 8
                                      JETH L. JONES, II, ESQ.
 9                                    ONE GREENWAY PLAZA, STE. 100
                                      HOUSTON, TX  77046
10
      FOR THE DEFENDANT,
11    NELSON AGAPITO VENTURA (2):     JOE A. SALINAS, III, ESQ.
                                      PO BOX 1305
12                                    HOUSTON, TX  77251-1305

13

14    FOR THE DEFENDANT,
      DANIEL REYNA (3):              ALI R. FAZEL, ESQ.
15                                   SCARDINO FAZEL
                                     1004 CONGRESS, THIRD FLOOR
16                                   HOUSTON, TX  77002

17    FOR THE DEFENDANT,
      ISRAEL SANCHEZ (4):            JOHN R. FRIESELL, ESQ.
18                                   THE NIELS ESPERSON BUILDING
                                     808 TRAVIS STREET, 24TH FLOOR
19                                   HOUSTON, TX  77002

20    FOR THE DEFENDANT,
      RODOLFO HERNANDEZ PEREZ (5):   DAVID ADLER, P.C.
21                                   6750 W Loop S
                                     Suite 120
22                                   Bellaire, TX 77401
                                     713-666-7576
23

24    ALSO PRESENT:                   AGENT JAMES EMERSON

25
```

1

2

3

| WITNESS: | Direct | Cross | Redirect | Recross |
|----------|--------|-------|----------|---------|

4

JAMES EMERSON

| By Mr. Khandelwal | 7 | . | . | . |
|-------------------|---|---|---|---|
| By Mr. Robinson | . | 45 | . | . |
| By Mr. Salinas | . | 49 | . | . |
| By Mr. Fazel | . | 58 | . | . |
| By Mr. Friesell | . | 77 | . | . |
| By Mr. Adler | . | 91 | . | . |

MRS. HINOJOSA PROFFER

| By Mr. Robinson | 97 | . | . | . |
|-----------------|----|---|---|---|

10

| EXHIBITS: | Marked | Offered | Received |
|-----------|--------|---------|----------|

(None offered.)

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1          HOUSTON, TEXAS; FRIDAY, JULY 18, 2014; 1:37 P.M.

2          (Official Interpreter present in the courtroom.)

3              THE BAILIFF:  All rise.

4              THE COURT:  Please sit down.  Thanks.

5              Ms. Wallace, can I get you to raise your right

6   hand for me, please?

7          (Interpreter sworn.)

8              THE INTERPRETER:  I do.

9              THE COURT:  Okay.  Thank you so much.  Are you-

10  all set up and ready to go?

11             THE INTERPRETER:  Yes.

12             THE COURT:  Okay.  All right.  We are here this

13  afternoon on Galveston Criminal Case 2014-12, the United

14  States versus Abel Hinojosa and others.

15             Could I get appearances for the Record?

16             Go ahead.

17             MR. KHANDELWAL:  Good afternoon, Your Honor,

18  Sharad Khandelwal on behalf of the United States.

19             THE COURT:  All right.

20             MR. ROBINSON:  Jared Robinson for Mr. Abel

21  Hinojosa.

22             MR. JONES:  Jeth Jones for Mr. Hinojosa, Your

23  Honor.

24             THE COURT:  All right.

25             MR. SALINAS:  Joe Salinas for Nelson Ventura,

1   Your Honor.

2            THE COURT:  All right.

3            MR. ADLER:  David Adler for Mr. Perez, Your

4   Honor.

5            THE COURT:  All right.

6            MR. FAZEL:  Ali Fazel for Mr. Reyna, Your Honor.

7            MR. FRIESELL:  John Friesell for Israel Sanchez.

8            THE COURT:  All right.  Why don't we get

9   Mr. Perez up here just for arraignment purposes so I don't

10  forget to do that?

11           All right.  Just for the Record, would you tell

12  me your full name, please?

13           MR. PEREZ-HERNANDEZ:  Rodolfo Perez Hernandez.

14           THE COURT:  All right.  And we've given you a

15  copy of the Indictment, correct?

16           MR. PEREZ-HERNANDEZ:  Yes, sir.

17           THE COURT:  And you've had a chance, not only

18  read through it, but talk with your lawyer some extent about

19  it; is that correct?

20           MR. PEREZ-HERNANDEZ:  Yes, sir.

21           THE COURT:  And do you think you understand the

22  nature of the charges brought against you in the Indictment?

23           MR. PEREZ-HERNANDEZ:  Yes, sir.

24           THE COURT:  All right.  David, at present, are

25  you -- do you believe your client is competent to go forward

1    here today?

2              MR. ADLER:  I do, Your Honor.

3              THE COURT:  And are you willing to waive the

4    formal reading of the Indictment?

5              MR. ADLER:  There's no need to read the

6    Indictment.

7              THE COURT:  All right.  And then how do you plead

8    this afternoon?

9              MR. PEREZ-HERNANDEZ:  Not guilty.

10             THE COURT:  Okay.  Great, thank you.  You can

11   have a seat.

12        (Mr. Perez complies.)

13             THE COURT:  All right.  That brings us to the

14   Detention Hearing.  Is the Government ready to go?

15             MR. KHANDELWAL:  Government is ready to proceed,

16   Your Honor.

17             THE COURT:  And are we going forward with it?

18             MR. KHANDELWAL:  Yes, Your Honor.

19             THE COURT:  Okay.  All right.  Then before we get

20   started I'll not, obviously, there is an Indictment here

21   that establishes probable cause to believe the Defendants

22   committed the offense alleged in Count I, as well as the

23   others.  That the alleged crime in Count I, as well as

24   Counts II and III create a presumption of detention under

25   the applicable statute and the pretrial services reports all

1  recommend detention.

2          Had everybody seen a copy of the presentence

3  reports?

4          ALL:  Yes, Your Honor.

5          THE COURT:  All right.  Sharad?

6          MR. KHANDELWAL:  Thank you, Your Honor.

7          Your Honor, we call James Emerson to the stand.

8          THE COURT:  All right.  If you'll raise our right

9  hand for me, please?

10          JAMES EMERSON, GOVERNMENT'S WITNESS, SWORN

11          THE WITNESS:  Yes, Your Honor.

12          THE COURT:  Okay.  Please have a seat and let us

13  know when you are ready.

14                  DIRECT EXAMINATION

15  BY MR. KHANDELWAL:

16  Q     Good afternoon.

17  A     Good afternoon.

18  Q     In a loud, clear voice, could you please introduce

19  yourself to the Court?

20  A     James Emerson.

21  Q     And what do you do for a living?

22  A     I'm a police officer with Galveston PD.

23  Q     And how long have you been doing that?

24  A     I've been a police officer for 11 years and prior to

25  that I was in the Marine Corps.

1  Q      You also work with the DEA?

2  A      Yes.  I'm assigned to the DEA Task Force.

3  Q      How long have you been a Task force Officer with the

4  DEA?

5  A      Four years.

6  Q      During your experience, your years of experience as a

7  police officer and working with the DEA, have you had a

8  chance to work on cases involving narcotics.

9  A      Yes, sir.

10  Q      And what about cases involving crystal

11  methamphetamine?

12  A      Yes, sir.

13  Q      Okay.  Can you give us a ballpark figure of how many

14  cases involving narcotics and how many crystal meth that you

15  have worked on?

16  A      Over 100 narcotic cases; dozens of methamphetamine

17  cases.

18  Q      Sir, I'm going to ask you about the facts that bring

19  us here on this case.

20         Sir, were you involved in a DEA operation known as

21  "Operation Frostbite"?

22  A      Yes, sir.

23  Q      And what was the purpose of this operation, in general

24  terms?

25  A      To arrest drug dealers in Galveston County.

1  Q     Was it focused on particular narcotics?

2  A     Yes, methamphetamine.

3  Q     What were -- can you describe, briefly, what the main

4  investigative tools that were used during this operation?

5  A     Undercover purposes, CS information, altoid analysis,

6  Title III intercepts, surveillance, both physical and

7  electronic.

8  Q     Was an Indictment eventually obtained by a Grand Jury?

9  A     Yes.

10 Q     And were people arrested in connection with this

11 Indictment?

12 A     Yes, sir.

13 Q     How many people were arrested?

14 A     Five.

15 Q     Are those five people here in the courtroom today?

16 A     Yes, sir.

17 Q     All right.  I want you to go through each of the five

18 people that were arrested; see if you see them in the

19 courtroom and please identify them by something that they

20 are wearing, where they are in the courtroom and by their

21 role.

22       Let's start with Abel Hinojosa; Hinojosa.

23            Do you see him in courtroom today?

24 A     Yes, front row, in the middle.

25            MR. KHANDELWAL:  Your Honor, let the Record

1   reflect the -- for identification.

2              THE COURT:  Sure.

3         (Defendant Hinojosa identified.)

4   BY MR. KHANDELWAL:

5   Q    Can you identify what his role in this conspiracy was?

6   A    He was a leader in this organization.

7   Q    What about Nelson Ventura?

8   A    Yes, he's front row, to the left.

9              MR. KHANDELWAL:  Again, Your Honor, let the Record

10  reflect -- for identification.

11             THE COURT:  Sure.

12        (Defendant Ventura identified.)

13  BY MR. KHANDELWAL:

14  Q    What was his role in this conspiracy?

15  A    A leader of -- organization.

16  Q    What about Daniel Reyna?

17  A    Yes, top row to the right.

18             MR. KHANDELWAL:  Again, Your Honor, I'd like the

19  Record to reflect -- for Id?

20             THE COURT:  It will.

21        (Defendant Reyna identified.)

22  BY MR. KHANDELWAL:

23  Q    Can you tell us what his role in this conspiracy was?

24  A    He was a distributor.

25  Q    A street level distributor?

1   A     Street level distributor.

2   Q     And what about Israel Sanchez?

3   A     Bottom row to the right.

4          MR. KHANDELWAL:  Again, Your Honor, let the Record

5   reflect for ID, Your Honor.

6          THE COURT:  All right.

7      (Defendant Sanchez identified.)

8   BY MR. KHANDELWAL:

9   Q     And what was his role in this conspiracy?

10  A     He was a courier.

11  Q     And, finally, Rudolph Perez?

12  A     Top row to the left.

13  Q     And can you tell us what his role in this conspiracy

14  was?

15  A     Also a courier.

16         MR. KHANDELWAL:  And, Your Honor, let the

17  Record --

18         THE COURT:  Sure.

19     (Defendant Perez identified.)

20  BY MR. KHANDELWAL:

21  Q     I'd like to direct your attention to the screen.  Did

22  you created a PowerPoint presentation --

23  A     Yes.

24  Q     -- to help us go through some of the facts that were

25  involved in this case?

1  A    Yes, sir.

2  Q    All right.  Can you tell us -- let's turn to the very

3  first slide here.  Can you tell us how this investigation

4  began in this case?

5  A    I was contacted by a confidential source.  He advised

6  that Nelson Ventura was selling methamphetamine.  He agreed

7  to -- well, he met with Nelson Ventura and he agreed to sell

8  the CS one-ounce of meth.

9  Q    Okay.  Do you know who he was trying to sell it -- who

10  the confidential source was buying on behalf of?

11  A    He was going to introduce me as the undercover --

12  posing as an out-of-state customer.

13  Q    Okay.  How much meth and for how much?

14  A    It would be ounce just as a sample and, I believe, it

15  was 1300.

16  Q    Okay.  What happened after Mr. Ventura agreed to sell

17  that amount to the Confidential Source?

18  A    He contacted the CS, I believe, the weekend after he

19  said that a load got knocked down.  He stopped communicating

20  with the CS.

21  Q    Okay.  In your experience as a law enforcement officer,

22  why would that happen?

23  A    Drug dealers are always suspicious of somebody talking

24  and somebody snitching.

25  Q    Okay.  When you say the, "Load got knocked down," what

1    did you mean by that?

2    A     Got seized by law enforcement.

3    Q     Go to the second slide in this.  What are we looking at

4    here?  What happened on May 9th, 2013?

5          Can you see that?

6    A     Yes, I see.

7    Q     Okay.

8    A     The CS was introduced to Abel Hinojosa, Christian

9    Ventura introduced him to him.  Said that, Abel worked with

10   his Uncle Nelson; that they were kind of like partners, and

11   that Abel could provide the CS and myself under a UC

12   capacity any amount of methamphetamine that I needed.  And,

13   on that date, that's when the CS introduced me to Abel.

14         I purchased one-ounce of methamphetamine for the same

15   price Nelson gave, 1300.

16   Q     Okay.  And where did this meeting take place?

17   A     In Galveston.

18   Q     Was it specifically at 4617 Court Crockett Boulevard?

19   A     Yes; parking lot.

20   Q     And it was one-once for $1300?

21   A     Yes, sir.

22   Q     During that conversation, did there come a time that

23   Mr. Hinojosa told you that he could supply more meth and

24   stuff?

25   A     Yes, sir.

1  Q     And what -- tell us about that sort of conversation?

2  A     He asked me how much I could move.  I told him I could

3  move about a pound a week.  He said, he was capable of

4  supplying that.

5  Q     Now, the product that you bought, was a DEA analyses

6  conducted on the substance itself?

7  A     Yes.

8  Q     And what were the results of that?

9  A     It was 97 percent purity.

10  Q     Now referring back to the Indictment, are these the

11  facts that underlie Count II of the Indictment?

12  A     Yes, sir.

13  Q     Okay.  All right.  Let's turn to the next, go to this

14  next slide.  Was this sale recorded in any way?

15  A     Yes, audio and video.

16  Q     Okay.  And the slide that we're looking at, is that

17  part of the recording?

18  A     Yes, sir.

19         MR. KHANDELWAL:  Okay.  Permission to pass to the

20  speakers?

21         THE COURT:  Sure.

22     (Videotape played to the Court.)

23  BY MR. YOUNG:

24  Q     I know that was a little hard to hear, but during that

25  part of that conversation, can you just tell us what we're

1  looking at and what actually happened?  Who's who and where

2  are you in this conversation?

3  A    I'm in the driver's seat.  That's Abel that the camera

4  is facing.  It's a small little camera.  It was in the

5  visor, so that's why you can only see the top of his head.

6  Q    Okay.  And during that part of the clip, what actually

7  happened?

8  A    That's when we were discussing the price of what pound

9  -- the math.  He advised it would be $14,000 a pound.

10 Q    Okay.  We have a second clip here as well, is that

11 right?

12 A    I believe so.

13      (Videotape played to the Court.)

14 BY MR. YOUNG:

15 Q    Can you tell us what happened in that part of the

16 conversation, again, knowing that it was also hard to hear?

17 A    It was -- it was a continuation of the original talk

18 about getting a pound a week.  I was posing like I was from

19 Oklahoma, Green Oak, Oklahoma and I was telling him that I

20 could move the pound a week as long as he could get it up

21 there.  Just, again, posing in a UC capacity, as most drug

22 buyers, they just don't have the money right then and there.

23 They need to get the product first before they can obtain

24 the money afterwards.

25 Q    Okay.  Now following that undercover purchase, what

1  happened?  Can you explain a bit more?

2  A    Just a little bit.  Just --

3  Q    Is that all?

4  A    Yeah.  That's a little bit.  He provided me his cell

5  phone number and we communicated directly from there.

6  Phototel analysis on Abel's phone also showed that his -- it

7  was fourth highest caller was Nelson Ventura.  So it

8  corroborated with what Christian Ventura told the CS.

9      Right here, is these text messages between myself and

10 Abel.  He asked me if I'm okay.  I said, yes, it was good.

11 Usually whenever a drug dealer sells somebody from out of

12 town or anybody drugs and they have a drive back, they try

13 to checkup to make sure they're okay.  They didn't get

14 stopped by police or anything like that and that's kind of

15 what this pretty much covers.

16 Q    And you're the riding in the green and Mr. Hinojosa is

17 the one that you circled white?

18 A    Yes, and that's his phone number at the top, the 354-

19 5199.

20 Q    Okay.

21 A    And then the second text message, I asked him how much

22 for the piñata chicas?  We call it the meth piñata's and

23 chicas would be the small for ounces instead of kilos.  He

24 says, "$1100 for an ounce of meth".

25 Q    Okay.  This language, this coded language, "piñata" and

1    "chica," is that fairly standard in the drug industry?

2    A    It's very, very standard.

3    Q    So, basically, when you're in this conversation here,

4    you're, essentially, asking for how much eight --

5    A    Eight-ounces.

6    Q    -- ounces of --

7    A    -- half of pound of methamphetamine.

8    Q    And that would price per key for the 1100 US dollars?

9    A    Yes, per ounce.

10   Q    Per ounce.  Okay.  After this meeting, were there --

11   did you and Mr. Hinojosa speak several times?

12   A    Yes.

13            MR. KHANDELWAL:  Again, Your Honor, if I could

14   have permission to approach the witness?

15            THE COURT:  Sure.  Oh, that's switched?

16            THE WITNESS:  They switched.

17        (Videotape played to the Court.)

18   BY MR. KHANDELWAL:

19   Q    So during that call, essentially, is information of the

20   eight piñatas -- eight-ounces of methamphetamine.

21   A    Yes, sir.

22   Q    Okay.  Now there was a text message that came right

23   after that as well?

24   A    Yes, sir.

25   Q    And what is that text message?  Tell us about that text

1   message?

2       Can you see it?

3   A    Barely.

4           THE COURT:  You can step down there, if you want.

5           THE WITNESS:  During that time is when those

6   tornados hit in El Reno.  He was asking how my family was.

7   I told him it would take a little bit longer and then I

8   confirmed with him that I would be coming down there.  I

9   believe that says, Tuesday or Thursday.

10  BY MR. KHANDELWAL:

11  Q    Okay.  In this text message, somebody write -- they

12  wrote, in the yellow, whose writing is this?

13  A    In the green in --

14  Q    In the green, yes.

15  A    In the green, it's going to be me and then the white is

16  going to be Abel.

17  Q    Okay.  So in this text message, you write, I'm going

18  out of town Thursday for piñatas.  Basically, you're asking

19  if -- you're saying, you meant, the methamphetamine; is that

20  right?

21  A    Yes, sir.

22  Q    Also, you write, "Do you have any fireworks for sale?"

23  When you say, "fireworks," what do you mean that?

24  A    I was referring to guns.  Later on, he misunderstood

25  me.  He thought I meant meth, as in fire, but I was trying

1   to refer to guns as fireworks.

2   Q    All right.  After this -- after that communication with

3   the Defendant, what happened next?

4   A    We met again, May 23rd, 2013, the same location as the

5   original buy on May 9th.  He got into the car and he pulled

6   out this -- you can see up there on the screen, the large

7   bag of -- which was methamphetamine.  I exchanged -- we

8   agreed for $8,800, however, I only had $8,000.  I paid him

9   the $8,000.  I advised him I would pay him $800 later on.

10  It was just a funding issue with DEA and then we talked more

11  about future purchases and then we also talked about guns.

12  Q    Okay.  We'll talk about the second time, but before we

13  get that far, this methamphetamine was it eventually tested

14  by the DEA?

15  A    Yes.

16  Q    And what did the DEA analysis result in?

17  A    I believe 96 percent or 97 percent.

18  Q    And this particular transaction with Mr. Hinojosa sells

19  it to you, is that the facts underlying Count III of this

20  Indictment?

21  A    Yes, sir.

22  Q    Now this conversation you had with Mr. Hinojosa, was

23  this recorded?

24  A    Yes.

25  Q    Okay.  Would you-- see what we're looking at right

1  here.  Can you explain to us what we're about to see?

2  A    This is the same things, it's the camera; since he was

3  sitting in the passenger seat, there was no way for me to

4  actually angle the camera at him other than making it look

5  obvious and holding it.  So I just placed it in the cup

6  holder.  You can hear the audio just fine.  It's just the

7  video is of the cup holder.

8  Q    Well, before -- before I ask you --

9        (Videotape played to the Court.)

10 BY MR. KHANDELWAL:

11 Q    Before we -- can you just preview for us, what exactly

12 happened in this conversation?

13 A    He advised me that he was going to -- six-kilos of

14 methamphetamine.  He told me he can send me all six-keys.

15 He also showed me a text message on his phone indicating

16 that six-kilos were coming in.  I believe they were coming

17 in that following day and then we talked about the

18 fireworks.  And, like I said he misunderstood me and thought

19 I meant meth when I told him, no, I mean, guns.  Do you have

20 any guns for sale?  And he said, no, that he was buying guns

21 and that he was sending -- buying big guns and sending them

22 to Mexico.

23 Q    Okay.

24        (Videotape played to the Court.)

25 BY MR. KHANDELWAL:

JAMES EMERSON - DIRECT BY MR. KHANDELWAL                    21

1  Q    Right at the very end of it you heard "I'm buying," and
2  "it's big money, big guns".
3  A    Yes.
4  Q    Okay.  And that was Mr. Hinojosa speaking?
5  A    Yes, sir.
6  Q    Okay.  Following that transaction, did you have some
7  text message correspondence with Mr. Hinojosa?
8  A    Yes, sir.
9  Q    And let's talk a little bit on May 24th, 2013.  Were
10 there some text messages between you and Mr. Hinojosa on
11 that date?
12 A    Yes, sir.
13 Q    Okay.  Tell us about these conversations.
14 A    We talked about the price for a kilo.  He originally --
15 when I originally asked him, he thought it was -- when I
16 said, "big piñatas," I believe he thought I meant a pound
17 since he said, $15,500.  I rephrased and said, "Big piñatas"
18 that are shaped like a bird just because "bird" is a common
19 term for a kilo.  He obviously understood me.  He said,
20 $31,000 and then he changed it to $30,000 for a kilo.
21 Q    He dropped the prices?
22 A    Dropped the prices to $30,000 for a kilo of meth.
23 Q    Okay.  All right.  And did you-all follow that up with
24 a phone after that text message?
25 A    Yes.

1       (Videotape played to the Court.)

2   BY MR. KHANDELWAL:

3   Q    Okay.  On there, initially, you talked about having 7

4   kilos, is that right?

5   A    Yes.

6   Q    Tell us about what happens with that part of the

7   conversation about the amount of kilos?

8   A    I asked him he -- well, how much he could give me on

9   credit which is typical amount -- transaction for the

10  dealers or buyers.  They can purchase half.  They can try to

11  get the other half on credit to pay them later on.

12  Q    Okay.  What did he say in response to that?

13  A    Yes, he could.

14  Q    Okay.  But what information would he need in order to

15  give that credit?

16  A    He needed the location of my address, where I lived.

17  Q    Like your home address?

18  A    Yes.  He said it was for safety purposes which

19  obviously you know it's in case I lost the drugs or

20  something happened they know where to find me.

21  Q    Okay.  What was your response to him about that?

22  A    I told him I would get it to him.

23  Q    You would get it --

24  A    Later -- yeah.  When we -- I told him I would give it

25  to him.  I told him that that's not where it would be

1  delivered but he said, yeah, but that's what they needed for

2  safety reasons.  And then I said, well, are the district

3  people saying that.  Meaning, like it's the people above

4  him.  He said, yes.  And then we agreed that I would just

5  pay for three-kilos up front and we would work out the

6  credit issue later on.  I'm sorry, four-kilos up front for

7  $120,000.

8  Q    Okay.  That later change -- the amount of kilo, did

9  that later change?

10 A    Yes.  He -- he contacted me the day before, which was

11 May 28th.  He advised that only three-kilos could fit into

12 the trap.  So then we agreed to do three-kilos for $90,000.

13 Q    Now how did he say he was going to transport the -- or

14 how was the conversation about transporting the meth from

15 Galveston up to Oklahoma where you're supposed to be from?

16 A    He said he had drivers that could take it.  He had

17 vehicles that had traps built into them.

18 Q    And was there a phone conversation in which you talked

19 about something similar?

20 A    Yes.

21 Q    Okay.

22     (Videotape played to the Court.)

23 BY MR. KHANDELWAL:

24 Q    Now you said before that the phone conversation with --

25 you said that you're going to need three-kilos of

1  methamphetamine that was fitted into the compartment?

2  A    Yes, sir.

3  Q    Okay.  Was there a text message, again, following that

4  to confirm the price?

5  A    Yes, sir.

6  Q    And is that the text message that we're seeing here?

7  A    Yes, yes, sir.

8  Q    And in the text message, essentially, you write, 90

9  doll- -- "90, right?"  Is that right?

10  A    Correct.

11  Q    And he says, "yes"?

12  A    Correct.

13  Q    Okay.  All right.  Following that, can you tell us,

14  basically, what happened July 28th, 2013, the day of the

15  actually transportation of the meth, supposedly, that you're

16  following?

17  A    We did surveillance, both ground and aerial.  We had a

18  plane up in the air following Abel.  When he left his house,

19  he travelled to Galveston.  He went to 1108 46 Street here

20  in Galveston.  At the time, we didn't know who he met with

21  until we identified him later on.  It was Rodolfo Perez.  We

22  observed Abel going to the, which we identified later, the

23  load vehicle, which was a Honda CRV and he got into the

24  driver's seat, back it into the carport of that residence.

25  Q    What was he doing -- what did it appear from

1  surveillance that he was doing -- that they were doing on

2  the vehicle itself?

3  A    Once -- once it got darker, they jacked up the vehicle

4  in the rear and they appeared to be working on it,

5  underneath the vehicle.  So we believe the trap was going to

6  be in the rear, underneath the vehicle.

7  Q    And, again, when you say the word "trap," you mean in a

8  compartment?

9  A    In a compartment.

10  Q    All right.  Was there aerial surveillance of that

11  vehicle going into the garage?

12  A    Yes.  This is video from the plane.

13  Q    Okay.  And just -- can you narrow it just to what we're

14  looking at here?

15  A    That's the white -- it's a Honda CRV.  That's the load

16  vehicle that transported the meth.

17  Q    Right in the middle of the street?

18  A    Yes.  And that's Abel that's getting into the car right

19  now.

20        (Videotape played to the Court.)

21  Q    Okay.

22  A    He's going to pull up and then back into a carport.

23  Q    So we see the car moving now?

24  A    Yes.  He just pulls forward and then he just backs up.

25  They don't actually go in the garage; they just go under the

1  carport.

2  Q    And, so, now we're seeing it actually being backed into

3  the garage -- or into the carport?

4  A    Yes.

5  Q    And that's where they were actually working on the

6  vehicle later on --

7  A    Once it got dark.

8  Q    -- after it got dark?

9  A    Yes, sir.

10  Q    Okay.  All right.  The following day on May 29th, 2013,

11  can you tell us what happened?

12  A    We stayed out on surveillance all night, into the

13  morning hours.  We -- Rodolfo ended up taking the vehicle

14  over to his house.  He left early that morning.  We followed

15  it, and along with aerial surveillance.  Once we realized he

16  was taking the direction that you would take to go to

17  Oklahoma, which he went through Houston and continued

18  45 Northbound, we contacted the Montgomery County Sheriff's

19  Office and they pulled him over for traffic violation.

20  Q    Okay.  What happened during the traffic stop?

21  A    The -- this is part of the video just from the plane,

22  but the Deputies are doing their drug interdiction.  They

23  end up locating the hidden compartment, which is in the rear

24  wheel wells of the CRV on both sides and then they locate

25  the three-kilos of meth.

1  Q    And that was the same area that you -- that someone had

2  observed them working on in the carport the day before; is

3  that right?

4  A    Yes, sir.

5  Q    Okay.  And this photograph that we're seeing on the

6  display here, is that actually a photograph of the crystal

7  methamphetamine that was recovered on May 29th, 2013?

8  A    Yes, sir.

9  Q    And actually, indicating on what side they were found?

10 A    Yes, sir.

11 Q    You said they were found in the -- exactly where were

12 they found again?

13 A    The rear wheel wells.  It's hard to say that word.

14 Q    And was the total amount was about how much?

15 A    Three kilograms.

16 Q    And was that the amount that was supposed to be

17 transported to your location in Oklahoma?

18 A    Yes, sir.

19 Q    Okay.  Was Mr. Perez then placed under arrest?

20 A    Yes, sir.

21 Q    And did he make any statements about what he was --

22 about this case at that point?

23 A    He made a statement to the Deputy that he was

24 transporting it to El Reno, Oklahoma and he was going to be

25 paid 5-6,000.

1   Q    And, did he specifically infer that he was transporting

2   the crystal methamphetamine?

3   A    Yes.

4   Q    And are these the facts that underlie Count IV of the

5   Indictment?

6   A    Yes.

7   Q    What happened during the -- during the search, the

8   first time the agents observed Mr. Perez's phone?

9   A    Yes, sir.

10  Q    And what did that reveal?

11  A    He had my undercover phone number saved in his phone as

12  Oklahoma.

13  Q    Who would give it -- have you ever talked to Mr. Perez

14  before this?

15  A    No, no.

16  Q    And who had you given that phone number to?

17  A    To Abel.

18  Q    Mr. Hinojosa?

19  A    Yes.  That's the one we communicated on.

20  Q    Okay.  Was Mr. Perez's GPS device in the vehicle, was

21  it also inspected?

22  A    Yes, sir.

23  Q    And what did that reveal?

24  A    It had the address that I gave Abel to take the

25  methamphetamine to in El Reno, Oklahoma.

1   Q    Okay.  Was there also some communications between

2   Mr. Perez and Mr. Hinojosa revealed during that arrest?

3   A    Yes, sir.

4   Q    Can you tell us about that?

5   A    The phone, it was in Spanish.  There was text messages.

6   He asked him if he had left yet.  He said, no.  He said,

7   he'd be on his way.  Told him to be careful.  He starts

8   telling him to answer because he's not answering his phone.

9   That's when he got pulled over.  And then at the end, he

10  says, return.

11  Q    He says, "Return"?

12  A    Yes.

13  Q    Okay.  All right.  After that, what happened -- was

14  there communications between yourself and Mr. Hinojosa?

15  A    Yes, sir.

16  Q    And what happened then?

17  A    We spoke telephonically.  He advised he hadn't been

18  able to get a hold of the driver.  He didn't know if there

19  were problems or what was going on.

20  Q    Okay.  I'm going to skip past this.

21  A    That's fine.

22  Q    At that point, was there any more communications

23  between yourself and Mr. Hinojosa?

24  A    After that which is typical, he ceased all

25  communications with me and changed his phone number.

1  Q    Following that event, was a Title III Wiretap obtained

2  by Court Order?

3  A    Yes, sir.

4  Q    Okay.  And what were on Mr. Hinojosa's phone?

5  A    Yes, sir.

6  Q    I want to talk about just some of the events that

7  happened during the Title III wiretap time period.  Let's

8  first talk about September 9th, 2013.  Was there a telephone

9  conversation between -- that was intercepted?

10  A    Yes, sir.

11  Q    If you can tell us about this telephone conversation?

12  A    It was between Abel and Nelson Ventura.  They advised

13  they needed to find another stash location.  They refer to

14  is as an office.  When I did a few uncover dealings with

15  Abel he referred to an office as a stash house.  When he was

16  talking with Nelson in this call, he said they needed to

17  find a new office that nobody knew about and they also

18  discussed the ability to move one kilo of cocaine a week.

19  They refer to it, specifically, as the "Maradona" kind.

20  And, based on the Title III calls, they were huge soccer

21  fans and anyone who that's a soccer fan knows who Diego

22  Maradona is and he was also known for his cocaine use.  So,

23  I believe the code word for Maradona was cocaine.  They

24  asked if they can move a kilo of cocaine a week.  They said

25  demand was high, but it could possibly be done.

1    Q     And what are we looking at with this next slide?

2    A     That's the actual line sheets written by the monitors.

3    Q     But this is, basically, a summary --

4    A     A summary of the call, yes.

5    Q     Okay.  Let's go forward to September 20th through 21st

6    of 2013.  At that time, was there a trip by Mr. Sanchez to

7    McAllen to pickup nine-kilograms of methamphetamine?

8    A     There was a planned trip.  Abel had talked to Robby

9    Moore, down in McAllen, Texas.  Robby was going to -- Robby,

10   Robin, was going to supply Abel nine-kilos of meth.  Abel

11   contacted Israel Sanchez and he asked Israel if he'd be able

12   to make that trip to pick it up.  Israel said he could.

13   Q     Was there any surveillance done following that?

14   A     Yes.

15   Q     And what did that surveillance reveal?

16   A     On that date of September 21st, we conducted

17   surveillance on Abel Hinojosa.  We observed him meet with

18   Israel at Israel's house.  They had talked previously about

19   getting together and discussing the trip to McAllen to

20   pickup those nine-kilos.

21        We observed Israel was driving a Toyota Tundra that was

22   registered to Nelson Ventura.  Once Abel and Israel left,

23   they left in different vehicles, but they drove in tandem

24   and we followed them to Ventura Auto Sales at --

25   Q     Ventura Auto Sales, what is Ventura Auto Sales?

1  A    It's a car dealership owned by Nelson Ventura.

2  Q    Okay.  And all right.  Let's jump forward now to

3  November the 2nd, 2013.  Were there some calls intercepted

4  about a trip by Mr. Sanchez to Mexico City to pickup nine-

5  kilos of meth?

6  A    Yes, sir.

7  Q    Tell us about these conversations?

8  A    Abel had a convers- -- or had multiple conversations

9  with two individuals in Mexico, Sebastian, last name unknown

10 is what the "LNU" is.  Sebastian LNU, we believe was out of

11 Mexico City and Victor LNU, who was out of Guadalajara, they

12 discussed sending Abel or providing Abel nine-kilos of

13 crystal meth.  Abel agreed or spoke with Israel about making

14 the trip to Mexico City to pickup those nine-kilos of

15 crystal meth.  Israel agreed that he would do it and they

16 discussed the payments -- also, I saw there at the bottom.

17 I believe it was Sebastian or it may have been Victor, had

18 advised Abel that once Israel picked it up and took it back

19 that he could get out whatever he needed, but the rest of it

20 would be transported to Atlanta, Georgia.

21 Q    Okay.  And what are we looking at here?

22 A    Same thing the line sheets.  The highlighted parts are

23 the actually parts that we just talked about.

24 Q    All right.  What happened there on November 4th, about

25 two days later, were there some calls intercepted about

1  different load vehicles and hidden compartments on those?

2  A    Yeah.  They were going to use -- we had identified it,

3  a Lincoln Navigator; that was the vehicle that Abel had met

4  with me both times during the undercover deals.  He talked

5  to -- we intercepted a call with him and Nelson Ventura.  He

6  advised that he wanted to show Israel how to work the load

7  vehicle and obviously work the hidden compartment.  He asked

8  if he could use Ventura Auto Sales.  Nelson told him, yeah,

9  that they can put it up on a lift and access the trap

10  through the front.

11  Q    So they're actually going to use Ventura Sales in order

12  to stash the work --

13  A    To show it, yes.

14  Q    -- and create the trap?

15  A    To show Israel how to work it, had to access it.

16  Q    Okay.  All right.  And what was Mr. Ventura's response

17  to that?  Did he agree to that?

18  A    Yes.  He actually said, we can put it on the lift and

19  access it through the front.

20  Q    This Lincoln Navigator, was it eventually seized?

21  A    Yes.

22  Q    And was there a trap -- a compartment found in the

23  front of the vehicle?

24  A    Yes, sir.

25  Q    In fact, when that vehicle was seized, whose car was it

1    -- whose name was the vehicle registered under?

2    A    It was registered to Israel.

3    Q    And who was actually driving the vehicle?

4    A    At the time of seizure, it was Abel.

5    Q    Abel Hinojosa?

6    A    Yes.

7    Q    All right.  Following that surveillance and those

8    reported calls, was there some more recorded calls about

9    sending some money via Western Union?

10   A    Yes, sir.

11   Q    Okay.  Tell us about what happened on those recorded

12   calls on November 9th, 2013?

13   A    Abel didn't have any money to provide Israel -- to pay

14   for the trip.  It's a long a trip to go from here to Mexico

15   City and back, which they eventually changed it to

16   Guadalajara and back, which is even further.  Victor, an

17   unknown -- unknown male in Mexico said that he would wire

18   Abel some money so that he could pay Israel for -- pay for

19   the expenses on the trip.

20   Q    And did that in fact happen?

21   A    Yeah.

22   Q    How many times and how much money?

23   A    I believe, it was 1,000 two separate times through

24   Money Gram.

25   Q    And were those records actually subpoenaed?

1  A    Yes.

2  Q    And they confirmed that, in fact, those transactions

3  did occur?

4  A    Yes.  It was, I believe, Reynaldo Escobar of -- it was

5  up north; Chicago maybe, Atlanta.  He's the one that

6  actually wired the money through Money Gram to Abel.

7  Q    And it was actually wired directly to Mr. Hinojosa's

8  name?

9  A    Yes, sir.

10 Q    Okay.  What was the plan for what was going to happen

11 with regards to getting Mr. Sanchez across and Mr. Hinojosa

12 from Mexico?  Can you tell us about that?

13 A    Once -- Israel was going to drive the Lincoln Navigator

14 going to Mexico, head to Guadalajara to pick it up, but once

15 he entered Mexico Abel had advised -- he had talked to his

16 father, Nino Hinojosa, Sr., and told him that he would be

17 flying in once Israel crossed into Mexico so that he could

18 sit down and meet with Victor and discuss the whole

19 transaction and future transactions.

20 Q    Where was Mr. Hinojosa going to fly to in Mexico?  Do

21 you know?

22 A    First it was Mexico City but, I believe, it changed

23 Guadalajara.

24 Q    Okay.  And what actually happened on this particular --

25 on November 13th, 2013?  Did there come a time Mr. Sanchez

1  got stopped by Mexico Transit Police?

2  A    Yes.  See -- that's where they actually -- Israel

3  actually left, incepted calls -- he called Abel.  Told him

4  he was on his way.  Once he made it into Mexico, Abel wasn't

5  able to get a hold of him.  He called Nelson.  Nelson was

6  able -- was unable to get a hold of Israel also.  They began

7  getting worried about what had happened.

8      What end up happening was Israel got in, his cell phone

9  wouldn't work.  He stayed with his, I believe his mother in

10 Rio Bravo.  He got stopped by a Transit Police.  He was

11 required to have a passport to get a permit to go further

12 into Mexico.  He didn't have his passport at the time and

13 then he came back across into the U.S.

14 Q    Okay.  Was there a conversation also about -- when he

15 came across, was there -- when he contacted Mr. Hinojosa,

16 did he say something about "slingshots" during that

17 conversation.

18 A    Yes, sir.

19 Q    Tell us about that?

20 A    There were lots of calls we intercepted beforehand.

21 Abel would refer to guns as "slingshots," specifically when

22 he talked to his Father Nino.  Because Nino wanted him to

23 send a sample of -- they called it a Pre-eta (phonetic) but

24 they also said it was kind the cops carried.  So we believe

25 they're Glocks, the single Glock, for him to show the people

1  over there if they were willing to buy them.  Again, they

2  refer to them as slingshots.

3       As Israel came back across, he said that they X-rayed

4  the vehicle.  He was worried that him getting stopped.  That

5  they might be suspicious.  Abel told him, he had nothing to

6  worry about.  He's like the X-rays didn't even find the

7  slingshot.

8       So, at that time, that was the first we heard that he

9  actually had a gun with him that he took into Mexico, but he

10 had crossed back into the U.S. with the gun.

11 Q    Okay.  And when he did that, Border Patrol never

12 actually was able to find the compartment?  They didn't know

13 to look for it either?

14 A    No.

15 Q    That that was there?  But eventually that Lincoln

16 Navigator was seized?

17 A    Yes.

18 Q    And that compartment was found?

19 A    Yes.  The trooper said it was one of the best

20 compartments he's seen.

21 Q    Okay.  All right.  Let's talk a little bit about Mr. --

22 the last remaining Defendant in this case, Mr. Daniel Reyna.

23      What was Mr. Reyna's role in this conspiracy?

24 A    He was a distributor.

25 Q    Okay.  Were there calls intercepted on the T3 wiretap

1   about him making purchases or buys of methamphetamine from

2   Mr. Hinojosa and Mr. Ventura?

3   A    Yes.  He would obtain it from both Abel and Nelson.

4   Q    Okay.  Let's talk about this first line here.  What are

5   we seeing here?

6   A    This is -- it shows the calls sessions.  Those are all

7   the incepted calls where they actually discussed this

8   particular one-ounce deal between Abel, Nelson and Daniel

9   Reyna.  Abel advised Reyna he had some meth.  Daniel said

10  that he had another source that he was getting it for -- for

11  cheaper.  Abel lowered the price to $800 an ounce and Daniel

12  agreed to purchase that for one -- one-ounce for 800 bucks.

13  Q    All right.  Was Mr. Hinojosa personally make the sale

14  to Mr. Reyna on this one occasion?

15  A    Not on this occasion, no.

16  Q    Tell us what happened?

17  A    Him and -- Abel and D. Reyna had to go to San Antonio

18  for the coffee business.  He contacted Nelson, said that he

19  was going to send Daniel over his way.  He was going to pick

20  up an ounce.  He told Nelson he -- if he had the money for

21  half, get it, if not that's fine.  He told Daniel to go over

22  to the car -- the car salesman, which is going to be Nelson,

23  that's where he would pick up the ounce.

24  Q    Okay.  This, that we're looking at right now, is one of

25  those line sheets talking about this conversation?

 1   A    Yes, between Abel and Daniel.

 2   Q    Okay.  Tell us about this slide here that we're looking

 3   at?  What are we looking at here?

 4   A    This is -- this is what I was talking about.  Abel

 5   called Nelson.  He asked him if he was at the lot which

 6   would be Ventura Auto Sales.  He asked him if the calculator

 7   is there.  The calculator is a common term for a scale.

 8   Nelson said, yes, he would go look for it.

 9   Q    Okay.  All right.  And what about this slide here.

10   What are we looking at here?

11   A    This --

12   Q    What is this photograph of?

13   A    That's Daniel.

14   Q    Of Mr. Reyna?

15   A    Yes, Daniel Reyna.

16   Q    And what happened with respect to that sale?

17   A    He went over there to Ventura Autos, did the deal.

18   Nelson called -- I believe, called or texted Abel back and

19   said that it was a done deal.  He didn't bring the money,

20   but he completed the deal.

21   Q    So Mr. Ventura made the sale on credit to Mr. Reyna on

22   Mr. Hinojosa's behalf and with him as well.

23   A    Yes, sir.  At Ventura Auto.

24   Q    Okay.  What about this slide here?  What are we looking

25   at here?

1       Can you see it?

2   A    Yes.  That's the call between Gabriel and Abel and he

3   tells him, go to the dealer car, which means car dealer.

4   And at the bottom part is when he tell, Abel tells Nelson

5   that "D" is on the way.  D was the term they referred to as

6   Daniel.  "D," and "Tattoo" was the two common terms for him.

7   Q    Okay.  And what about this line?  What are we looking

8   at here?

9   A    That's when Nelson texted Abel back, said he came

10  already, but he did not bring any money; that money symbol.

11  And, then Abel said, okay.  That is fine.

12  Q    All right.  That was the very first sale recorded for

13  Mr. Reyna.  Was there others as well?

14  A    Yes.

15  Q    In fact, how frequent were these sales for Mr. Reyna?

16  A    At least once a week, if not more.

17  Q    All right.  Was there a second one recorded on November

18  -- well, let's first talk about -- hold on a second.

19       What are we looking at with respect to this slide?

20  A    It's almost the same thing as the last two.  Daniel

21  contacted Abel.  He asked if he could pick up the meth at

22  Ventura Auto Sales and if he could also drop off the money

23  there.  Abel said that was fine.

24  Q    This is just two days after he had already bought an

25  ounce of crystal methamphetamine from Mr. Ventura; is that

1   right?

2   A    Yeah.  He got it on credit, yes.

3   Q    And two days later he's asking for more, essentially?

4   A    Yes.

5   Q    Was there an actual transaction recorded, eventually,

6   on November 16th, 2013?

7   A    Yes, sir.

8   Q    This photograph we're looking at here, what is it?

9   A    That's Daniel.

10  Q    And so in the second one was also -- was actually sold

11  by Nelson Ventura to Mr. Hinojosa; is that right?  I'm

12  sorry, to Mr. Reyna?

13  A    Two -- yes, sir.

14  Q    Rather than going through all the rest of them, was

15  there a third one recorded on November 23rd, 2013?

16  A    Yes, sir.

17  Q    And a fourth one recorded three days later on

18  November 26th, 2013?

19  A    Yes, sir.  That's the one we stopped them.

20  Q    Okay.  Tell us about that?

21  A    On the fourth transaction between Daniel -- he spoke

22  with Abel.  They discussed meeting at the La Marque Food

23  Store.  It's right there off of Main Street and Bayou.  We

24  conducted surveillance.  We saw Daniel driving a black Dodge

25  Charger which we knew is what he would -- he typically

1   drove.  Abel was driving a gold Jaguar, which I believe he

2   actually obtained from Daniel a month before.  Once they met

3   at the food store, we saw Daniel depart.  I contacted the

4   La Marque PD.  They pulled over the Charger.  Daniel was the

5   driver and Emily Picasso (phonetic) was the passenger.

6   Q    You just pointed out, is that Emily Picasso sitting in

7   the courtroom here?

8   A    Yes.  She's in the front row -- front left row, second

9   to the right.

10          MR. KHANDELWAL:  Your Honor, let the Record

11   reflect, Emily present -- identification that the witness

12   has made.

13          THE COURT:  Okay.

14      (Emily Picasso identified.)

15   BY MR. KHANDELWAL:

16   Q    All right.  What happened next?

17   A    The officers didn't find any meth.  Both of them had

18   warrants.  I believe, Daniel had warrants out of La Marque.

19   Emily had warrants out of Galveston.  Galveston PD officer

20   came and picked up Emily and transferred her -- transported

21   her to the Galveston County Jail and Daniel was taken to the

22   La Marque City Jail.

23   Q    Okay.  What happened after that?

24   A    The following day, Daniel called Abel.  Told him he got

25   pulled over.  Abel said he had saw the cop.  There was

1   actually a marked unit that was sitting pretty close.

2   Daniel said that they didn't find the meth and this his girl

3   was looking out for him, Emily, and that Emily was holding.

4   And Abel asked him, well what happened to it?  And Daniel

5   said, it had to go down the toilet at the jail.

6        He said that Emily didn't want him to get in trouble,

7   so that's why she was holding it for him.

8   Q    And following this, on November 27, 2013, was another

9   -- was another transaction recorded between Mr. Hinojosa and

10  Mr. Reyna, another ounce of crystal meth?

11  A    Yes.  We went out again on surveillance and Abel

12  delivered an ounce to Daniel's shop which has since closed

13  down, over on Cedar, 3047 Cedar Drive.

14  Q    I'm sorry, what date was that?

15  A    November 29th, I believe.

16  Q    November 29th?

17  A    (No audible response.)

18  Q    And what are we looking at with these text messages

19  here?

20  A    Line sheets of the calls.

21  Q    Okay.  Following -- following these transactions and

22  after the Grand Jury returned an Indictment, were arrests of

23  the Defendants made?

24  A    Yes, sir.

25  Q    I want talk about one particular arrest, Mr. Reyna.

1  Was a search warrant conducted during his arrest?

2  A    No, just the arrest warrant.

3  Q    Okay.  And what happened?  Was there a search

4  conducted?

5  A    Yes.

6  Q    And tell us about that?

7  A    Officers went over there to his trailer, 1818 Main

8  Street, Lot Number 14.  They found Daniel as he was coming

9  out of the trailer.  I think it was around 6:30, placed him

10 under arrest.  Emily and, I believe, Daniel's cousin was

11 located in the trailer.  They got consent to search the

12 trailer.  They located two assault rifles, two mini-machine

13 guns and four pistols and one was stolen out of Brazoria

14 County.

15 Q    You said -- you said the guns, you said, there was --

16 A    There were eight guns -- eight guns in total.

17 Q    Eight guns in total.

18 A    And, I think, maybe several hundred rounds of

19 ammunition and then two baggies of crystal meth that ended

20 up being half an ounce.

21 Q    Okay.  Thank you.

22         MR. KHANDELWAL:  No further questions, Your

23 Honor.

24         THE COURT:  Jared, any cross examination?

25         MR. ROBINSON:  Yes, Judge, if you don't mind?

1          THE COURT:  Not at all.

2              CROSS-EXAMINATION OF JAMES EMERSON

3  BY MR. ROBINSON:

4  Q    Officer Emerson, it sounds like during several of your

5  discussions with Mr. Hinojosa that there was a

6  misunderstanding in terminology; is that right?

7  A     Yes, with fireworks.  There was only that one

8  occasion.

9  Q    Okay.  I mean, isn't it reasonable to believe that

10 other things that you-all had discussed there was

11 misunderstanding about as well?

12 A     No, because we clarified it every time.

13 Q     Didn't seem like there was any clarification during --

14 A     There was.  On the video that played the fireworks, we

15 actually, quote the "cortes," which is guns.  And, we

16 actually -- he physically says, "guns, big guns".  So there

17 was clarification.

18 Q     Okay.  Did you ever -- during the search of -- you did

19 a search of the cell phone; is that correct?  I'm not

20 talking about the -- I'm not talking about the surveillance

21 of the phone calls, I'm talking about --

22 A     During Rodolfo's --

23 Q     -- the cell phone search.

24 A     During Rodolfo's arrest?

25 Q     Correct.

JAMES EMERSON - CROSS BY MR. ROBINSON                    46

1   A      Yes.

2   Q      Did you-all have a search warrant for that phone?

3   A      At that time we didn't need one.

4   Q      You didn't need one?

5   A      No.  You could search searches 'til arrest.

6   Q      And can you tell me exactly what traffic violations

7   Mr. Perez made which gave Montgomery County Sheriff's Office

8   probable cause to stop him in the first place?

9   A      Again I'd have to refer to the Montgomery County

10  Sheriff's Office report.

11  Q      The surveillance, the aerial surveillance, that you-

12  all conducted on the home that we saw --

13  A      Yes.

14  Q      -- is that the entire surveillance video?

15  A      No.  That's very, very long.

16  Q      Okay.  We don't see any work being done on that

17  vehicle, correct?

18  A      Correct.

19  Q      Do you have surveillance video showing work being done

20  on that video?

21  A      The airplane doesn't fly after -- once it gets dark.

22  Q      Okay.  So you're just assuming the work was done --

23  A      No.  I actually saw it.  There was -- there was maybe

24  just over a dozen agents and officers that were out there

25  conducting ground surveillance.

1  Q      Officer Emerson, did you -- did you, yourself, see

2  that?

3  A      No, I did not.

4  Q      Okay.

5  A      There's a reason.  I couldn't get close because of my

6  undercover dealings with Abel.

7  Q      Now in addressing Mr. Hinojosa specifically, are you

8  familiar with an arrest of Mr. Hinojosa on May 6th of this

9  year?

10 A      Yes, sir.

11 Q      In Wharton County, Texas?

12 A      Yes, sir.

13 Q      And that was -- and were you present for that?

14 A      Yes, sir.

15 Q      Okay.  And was that stop and arrest part of this

16 ongoing investigation?

17 A      Yes, sir.

18 Q      And what was he arrested for?

19 A      Like I said, you'd have to refer to their actual

20 report.  I didn't make the arrest.  I believe, it was

21 something to do with crim- -- unlawful use of criminal

22 instrument.

23 Q      Okay.  And -- but it was -- it is part of this ongoing

24 investigation?  It's not a separate offense outside of

25 this --

1    A     Us being out there, yes, it was part of this

2    investigation.

3    Q     All right.  Do you have a working knowledge of that

4    pending case?

5    A     No, I don't.

6    Q     You don't -- you don't have any -- you haven't had any

7    communications with either the law enforcement agency or the

8    district attorney's office in that county regarding that

9    charge?

10   A     No.

11   Q     During that stop, were any narcotics recovered?

12   A     No.

13   Q     Were any guns recovered?

14   A     No.

15   Q     Any sums of money recovered?

16   A     No.

17   Q     During the arrest of Mr. Hinojosa at his home for this

18   Indictment, were there any large sums of money recovered?

19   A     No, none.

20   Q     Any guns recovered?

21   A     No.

22   Q     Any drugs recovered from his home?

23   A     No.

24   Q     You also seized two vehicles; is that correct?

25   A     Yes, sir.

1   Q      Any guns recovered from those vehicles?

2   A      No, sir.

3   Q      Drugs or money?

4   A      None.

5            MR. ROBINSON:  Pass the witness, Judge.

6            THE COURT:  Joe?

7            MR. SALINAS:  Okay.

8            THE COURT:  You're next in line.  Sure.

9               CROSS-EXAMINATION OF JAMES EMERSON

10  BY MR. SALINAS:

11  Q      Agent Emerson, my name is Joe Salinas and I represent

12  Nelson Ventura.

13         Did you assist in preparation of the video, the

14  PowerPoint presentation?

15  A      Yes, I created the PowerPoint.

16  Q      You indicated that Nelson Ventura is the co-owner of

17  Ventura Auto Sales?

18  A      Yes, sir.

19  Q      Is that correct?

20  A      Yes, sir.

21  Q      Did you check with the Texas Secretary of State to see

22  who the registered owners are of Ventura Auto Sales?

23  A      I believe its Hector and Juan Ventura.

24  Q      But Nelson is not co-owner of Ventura Auto Sales?

25  A      I don't know.

1    Q    He's not registered with the Secretary of State as the

2    owner, is he?

3    A    I couldn't tell you that.  I'd have to refer to those

4    records.

5    Q    Okay.  Now --

6    A    I know he -- he runs the business there.

7    Q    He works there, as far as you know?

8    A    He runs the business, as far as I know.

9    Q    Okay.  Now part of the presentation indicates that

10   Homeland Security investigations observed that there was

11   large amounts of cash going through the bank account; is

12   that correct?

13   A    Yes, sir.

14   Q    All right.  Now, how do they observe that?  Does the

15   bank notify them where amounts over $10,000 were going

16   through the account?

17   A    I can't -- I can't speak on how -- how they work or

18   how Homeland Security or their financial aspect works, but

19   that's the information that was passed onto me.  That they

20   observed, I believe it was, $800,000 in that account and

21   large sums of money were going in and out of that account

22   that weren't consistent of a small car dealership.

23   Q    All right.  So, basically, an agent assigned contacts

24   DEA and says, there's a large volume of cash going through

25   the car dealership?

1  A     Yes.  HSI contacted me since I'm from Galveston and I

2  worked on the DEA Galveston Task Force, asked if I knew

3  about Ventura Auto Sales, if I knew about --

4  Q     Now do -- do you -- as part of your investigation, do

5  you do anything, say, with the IRS to determine whether or

6  not the funds were being deposited or being reported to the

7  IRS as business income?

8  A     Our -- our financial team works with the IRS, yes.

9  Q     Okay.  So, as far as you know, was any of that done

10 with --

11 A     Yes.

12 Q     -- Ventura Auto Sales?

13 A     Yes, I believe they did.

14 Q     And part of the investigation didn't reveal that all

15 the income had been recorded?

16 A     It's still ongoing, the financial investigation.

17 Q     Now without telling me about the confidential source,

18 you're stating that a confidential source, through DEA,

19 actually approached Nelson Ventura; is that correct?

20 A     Yes.

21 Q     Okay.  And was that conversation recorded?

22 A     No.

23 Q     But in your presentation you're stating that the

24 confidential source had a conversation with Nelson Ventura

25 about providing a sample of meth?

1  A     Yes, one ounce.

2  Q     And there was another meeting or, I guess, phone call

3  that says the load was lost --

4  A     Yes.

5  Q     -- and you didn't deal with the confidential sources?

6  A     Correct.

7  Q     And you're claiming that there was another meeting

8  with a Christian Ventura who's Nelson's nephew; is that

9  correct?

10 A     Correct.

11 Q     The confidential source met with him and was that

12 recorded?

13 A     No.

14 Q     And are you stating that Christian Ventura is the

15 individual who introduced you to Mr. Hinojosa?

16 A     No.  Christian Ventura introduced the CS to Abel

17 Hinojosa.

18 Q     So Christian Ventura introduced the confidential

19 source to Mr. Hinojosa?

20 A     Yes.

21 Q     Now on one of the pages under, "Undercover purchases"

22 there's a section that says, "Final title," and you actually

23 have Hector Ventura as the final title of that sale?

24 A     Yes.

25 Q     Why is that -- why is that important?

1  A     At the very beginning of the investigation, we have to

2  provide a file title, a name.  Since this all started with

3  Ventura Auto Sales and the money that was in the account, he

4  was found to be the oldest brother and he was the owner of a

5  lot of stuff, even the cell phone that Nelson used, he was

6  listed as the -- the user.

7  Q     So you named the file after him, as opposed to Nelson;

8  is that correct?

9  A     Well, like I said, before, the investigation varies --

10 it starts, from day one, we have to provide a file title, a

11 name.  We didn't have Nelson identified until, obviously,

12 later on in the investigation.

13 Q     And now wanting to -- this section here, it calls of

14 the 968, which was on September the 9th.  I guess there's a

15 phone call between Mr. Hinojosa and Mr. Ventura and I guess

16 they're discussing the stash house and you indicated that an

17 office means stash house?

18 A     Correct.

19 Q     Is there some conversation between Mr. Hinojosa and

20 Mr. Ventura defining what office means?

21 A     No.

22 Q     That your understanding of what office means?

23 A     No.  That's my understanding with Abel.  There's a

24 recorded call between me and Abel where he asks if I -- if I

25 have an office where we can offload the meth.

1  Q     But there's no conversation between Mr. Hinojosa and

2  Mr. Ventura that defines that an office means a stash house?

3  A     No.  That would be crazy if they -- they actually did.

4  Q     Well, I'm just saying there's nothing that --

5        (Crosstalk.)

6  A     Yeah.  Well --

7  Q     -- they knew --

8  A     -- Yeah.  They're not going to say like, hey, this

9  actually means methamphetamine if anybody --

10 Q     But it's an understanding that you have with

11 Mr. Hinojosa?

12 A     Yes.

13 Q     Not that Mr. Hinojosa has with Mr. Ventura, correct?

14 A     Yes.  When he referred to office, he referred to stash

15 house to me.  I assumed future conversations the office

16 meant stash house.

17 Q     Okay.  And the vehicles that are sold by Ventura Auto

18 Sales are used vehicles; is that correct?

19 A     Yes, sir.

20 Q     Okay.  And is it your understanding that whenever a

21 vehicle is sold in Texas, whether it is a new vehicle or a

22 used vehicle, that the dealership provides paper tags for

23 the vehicle --

24 A     Correct.

25 Q     -- until such time as they get a hard license plate?

1  A      Yes, sir.

2  Q      Correct?  So on September 21st, when Mr. Sanchez is

3  stopped driving a Toyota Tundra bearing paper plates, it

4  actually comes back to Ventura Auto Sales; is that correct?

5  A      Yes, it was purchased from Ventura Auto Sales.

6  Q      So that basically means that Mr. Sanchez bought a car

7  from Ventura Auto Sales?

8  A      I believe so.  I don't know if he did or not.

9  Q      But the tag comes from --

10 A      The vehicle he was driving, yes, correct, was -- comes

11 back to Ventura Auto Sales.

12 Q      So when you state, here it's registered to Nelson

13 Ventura, that's really not correct.  It's actually

14 registered to the car lot?

15 A      I'd have to check.

16 Q      Okay.  You've actually been to the car lot; have you

17 not?

18 A      Not physically on the car lot but, yes, I've been --

19 conducted surveillance there.

20 Q      There's a conversation on November 4th where, I

21 believe, Mr. Hinojosa is talking to Mr. Ventura and it

22 concerns a load vehicle and, I guess, the use of a lift or a

23 jack at the auto sales lot; is that correct?

24 A      Something that could jack up the vehicle, yes.

25 Q      Okay.  And that conversation, basically, is something

1  like when you use the lift at your lot so Mr. Sanchez can

2  see where the compartment is.  Is that --

3  A     He said --

4  Q     -- a fair summary of -- the deal was the load vehicle

5  was going to the car lot?

6  A     Uh-huh.

7  Q     Okay.  The purpose of the vehicle going to the car lot

8  was they wanted to utilize the lift; is that correct?

9  A     No.  The purpose of the vehicle going to the car lot,

10 Abel wanted to show Israel how to access the trap and how to

11 actually work the trap, the hidden compartment.

12 Q     But they could have done that anywhere.  So they were

13 basically going to the car lot to use some sort of lift that

14 was under the truck?

15 A     No.  Because you -- you -- you had to -- you had to

16 get underneath the vehicle to access it.  There's no way you

17 could have just done that one the side of the street.

18 Q     So, I mean, the car had to be up on something for them

19 to access?

20 A     Jack it up or anything.  Somewhere enclosed.  I mean

21 it's not something you do in public.

22 Q     All right.  Now there's no conversation between

23 Mr. Hinojosa and Mr. Ventura concerning guns or slingshots

24 or anything like that, is there?

25 A     Yes, there is.

1    Q       There is?

2    A       Yes.

3    Q       Is that not --

4    A       No, it's not --

5    Q       -- it's not part of the conversation?

6    A       It would be impossible to put every -- every single

7    Title III incept in that PowerPoint.  But, yes, they

8    discussed.  I believe Nelson was obtaining a gun from, I

9    can't remember the individual's name, they called him by his

10   nickname and -- and I know he was a felon because he was

11   worried about getting rid of the gun soon because he was a

12   felon and Nelson was trying to arrange that transaction

13   between Abel and that individual.

14   Q       So you're stating that there is a conversation between

15   Mr. Hinojosa and Mr. Ventura concerning --

16   A       Guns, yes.

17   Q       -- a weapon or weapons?

18   A       Yes, sir.

19   Q       And what -- what role did you say Mr. Ventura played

20   in this conspiracy?

21   A       A leader.  He was partners with Abel.

22   Q       So you would -- you would say that Mr. Hinojosa and

23   Mr. Ventura were on the same level?

24   A       Yes, sir.

25           MR. SALINAS:  Pass the witness, Your Honor.

1          THE COURT:  Ali?

2          MR. FAZEL:  May I proceed, Your Honor?

3          THE COURT:  Sure.

4              CROSS-EXAMINATION OF JAMES EMERSON

5   BY MR. FAZEL:

6   Q     Agent or Officer, good afternoon.  My name is Ali

7   Fazel.  I represent Mr. Reyna.  I'm thinking you and I have

8   never met before, have we?

9   A     No, we haven't.  I think you're the only one I haven't

10  met.

11  Q     Let me -- so that I understand or make sure that I

12  understand the facts clearly --

13  A     Yes, sir.

14  Q     -- after September the 13th, all the evidence you

15  folks have and "by you folks," I mean you and the other

16  agents or other people that worked on the case, came from

17  Title III wiretaps, correct?

18  A     Everything after September 13th?

19  Q     Yes, sir.

20  A     No.  But, I mean, there was the guns that we recovered

21  from Daniel Reyna's residence.  That didn't come from the

22  Title III.

23  Q     Okay.  Well, that was during his arrest, correct, and

24  we'll get there in a minute.

25  A     Well, you --

1  Q      But I'm talking about everything as far as your

2  knowledge and what transactions took place, what was sold

3  when and where.  That was through Title III wiretaps,

4  correct?

5  A      Not strictly Title III wiretaps but, in general, yes,

6  if that's what you're asking.

7  Q      All right.  Are there any videos, that you're aware

8  of, involving Mr. Reyna, after September 13, 2013?

9  A      No videos, no.

10 Q      Are there any kind of pole cameras or anything of

11 eyesight, people watching Mr. Reyna after September 13,

12 2013?

13 A      Yes.

14 Q      Okay.  And let me get back to that in a minute, but

15 let me ask you this.  Prior to September 13, 2013, did you

16 even know Mr. Reyna existed?

17 A      Yes.

18 Q      And how did you know that?

19 A      I was contacted, and it was earlier that year, by

20 Homeland Security in Boston --

21 Q      In, I'm sorry, where?

22 A      Boston.

23 Q      Boston.

24 A      Boston, Massachusetts.  They had an individual that

25 was cooperating.  He said that he was purchasing cocaine and

1  methamphetamine and purchasing guns from an individual he

2  only knew as D-Rock.  He gave an address to a tattoo place

3  he had which ended up being the location on Cedar and he

4  provided Daniel's phone number.  It was 497-5197.

5  Q     Okay.  This individual that provided that information

6  to you, during your investigation, did you become aware or

7  do you have any knowledge of Mr. Reyna selling or obtaining

8  or being involved, in any way, with cocaine?

9  A     Yes.

10 Q     Okay.  And are those part of your Title -- of course

11 we haven't seen all of your Title III wiretaps, right?

12 A     Yeah.

13 Q     Okay.  So is that part of the Title III wiretaps?

14 That you became aware of that?

15 A     No.  I was aware of it, before, from the Homeland

16 Security in Boston that --

17 Q     Let me ask the question a different way.  You're not

18 understanding it; I'm not being clear.

19       Other than the Homeland Security snitch telling you

20 that Mr. Reyna is involved in this activity, do you have any

21 other knowledge, through Title III wiretaps, through video,

22 through any other source, that Mr. Reyna sold cocaine?

23 A     No.

24 Q     Okay.  Other than this snitch talking about the guns

25 and you finding some guns during a search, which we'll get

1  to in a minute --

2  A      Uh-huh.

3  Q      -- do you have any knowledge through videos, through

4  your eyeballs, through any agency looking or seeing

5  Mr. Reyna being involved in the purchase or sale of guns?

6  A      Can you -- can you repeat the -- the --

7  Q      Sure.

8  A      Other than?

9  Q      Other than the snitch telling you so --

10  A      Uh-huh.

11  Q      -- do you, personally, or any agents in this case,

12  personally, have knowledge, through Title III wiretaps,

13  through videos, through them looking, that Mr. Reyna sold

14  guns to anybody?

15  A      No.

16  Q      Okay.  So no cocaine, no guns, correct, to your

17  knowledge?

18  A      Incorrect.  In -- if you're limiting me to a time

19  frame and excluding certain events then yes, but, in

20  general, no.  I am aware of him --

21  Q      Through your investigation minus the snitch.

22  A      Okay.  Minus the snitch and then minus what else?

23  Q      Minus the snitch; that's it.

24  A      Okay.

25  Q      Minus the snitch.  Do you have any knowledge, through

1  your investigation, of Mr. Reyna selling or purchasing guns?

2  A     No, I told you that.

3  Q     Okay.  That's what I'm saying.  So other than the

4  snitch testifying or talking to an agent in Boston, you,

5  personally, through your investigation, do not have

6  knowledge of Mr. Reyna buying or purchasing guns, selling

7  guns, or buying or selling cocaine, correct?

8  A     Correct.

9  Q     All right.

10 A     Okay.

11 Q     All right.  Would it be accurate to say that the

12 majority, if not all, of your information regarding

13 Mr. Reyna came from the Title III intercepts?

14 A     No.

15 Q     No.  Okay.

16 A     The original information came from the HSI informant.

17 Q     Okay.  Is there a parallel investigation into

18 Mr. Reyna?

19 A     Not that I'm aware of.

20 Q     Okay.  The sales that you discussed with the

21 prosecutor, I believe there's four of them, correct, that we

22 discussed --

23 A     Five of them, I believe.

24 Q     November 23rd, November 26th, November 27th and

25 November 29th.  You with me?

1   A      I believe there was five.  If --

2   Q      Okay.  So November the 16th.  Is that the one you're

3   referring to?

4   A      Like I said, I can't remember exact dates off the top

5   of my head.  If you want, we can review them again, but --

6   Q      Let's start with your version; five of them.

7   A      Okay.

8   Q      I believe you.  In these five transactions, these all

9   were information that on these five transactions that you

10  testified about --

11  A      Correct.

12  Q      -- all came from the Title II wiretap, correct?

13  A      And surveillance, correct.

14  Q      And surveillance.  Which one -- if you can tell me

15  which one has surveillance there?

16  A      The one where Emily got stopped.  They're in a vehicle

17  and the one where he -- I believe, it was the fifth one

18  where Abel actually delivered it to a shop.

19  Q      Okay.  So the one that Emily was involved with had

20  people looking at the transaction?

21  A      Correct.

22  Q      And then the one that Abel delivered to his shop?

23  A      Correct.  On Cedar.

24  Q      All right.  Now each one of these transactions were

25  one-ounce transactions, correct?

1  A     Correct.

2  Q     Okay.  So the totality of your knowledge of

3  Mr. Reyna's involvement in this conspiracy is five-ounces?

4  A     Correct.

5  Q     To your knowledge, Mr. Reyna did not purchase other --

6  I know there was a phone conversation involving Mr. Reyna

7  and, I believe, it was Mr. Hinojosa talking about that he,

8  maybe, found drugs somewhere cheaper.  Remember testifying

9  about that?

10 A     Yes, sir.

11 Q     Other than that phone call, there's no information

12 that you have during this investigation that Mr. Reyna

13 purchased narcotics from anybody else other than

14 Mr. Hinojosa and the totality was five-ounces?

15 A     Other than that -- excluding that call, correct.

16 Q     Okay.  Based -- since you smiled about it, let's talk

17 about it.  On that call that you're talking about, did you

18 follow up to see who he was purchasing from?

19 A     No.

20 Q     Do you know who he was purchasing from?

21 A     No.

22 Q     Okay.  So back to my original statement.  So the

23 totality of Mr. Reyna's involvement in this conspiracy is

24 five-ounces?

25 A     Correct.

1   Q      You have no knowledge of him sending weapons to

2   Mexico?

3   A      No.

4   Q      You have no knowledge of him buying weapons from

5   anybody to send to Mexico?

6   A      Correct.

7   Q      Okay.  You have no knowledge of him purchasing kilo-

8   type drugs?

9   A      Correct.

10  Q      Okay.  To your knowledge and your -- by the way, you

11  went up on Title III wiretaps on whose phone?

12  A      Abel Hinojosa.

13  Q      Anybody else's?

14  A      No.

15  Q      Okay.  To your knowledge, is there any video of

16  Mr. Reyna doing anything?

17  A      No.

18  Q      So the evidence that you have is either agents

19  describing events that they had witnessed or Title III

20  wiretaps?

21  A      Correct.  And, obviously, the guns recovered from the

22  arrest.

23  Q      Okay.  And I promise we'll get to that.

24  A      Okay.  Well, I just don't want to exclude it.

25  Q      No, I hear you.  Okay.

1          Now was there an investigation started on this snitch

2     talking in Boston about Mr. Reyna?

3     A     Correct, yes.

4     Q     Okay.  And was this the investigation that was --

5     A     No.

6     Q     No.  Another investigation was started?

7     A     Yes.

8     Q     Is he still under investigation?

9     A     No.

10    Q     Okay.  Are you, or anybody else that you're aware of,

11    going to plan on charging him in another location for any

12    activity?

13    A     Not that I'm aware.

14          MR. KHANDELWAL:  Objection.

15          THE COURT:  I'll let him answer the question.

16    I'll ignore it, if it's irrelevant.

17          THE WITNESS:  It's not that I'm --

18          THE COURT:  It's my job.

19          THE WITNESS:  -- not that I'm aware.

20    BY MR. FAZEL:

21    Q     The investigation that you're describing, the

22    secondary investigation, did it provide information to you

23    or other agents?

24    A     It was to us; DEA Galveston.

25    Q     Okay.  So all of the investigations that you have put

1  together, that you're testifying about, about Mr. Reyna, not

2  anybody else --

3  A       Uh-huh.

4  Q       -- all of the investigations that you have together,

5  right now, tells you that he's bought five-ounces of

6  methamphetamine and that's it?

7  A       Yes, that's what I can prove.

8  Q       Okay.  You described him as a street-level dealer,

9  correct?

10  A       Correct.

11  Q       Which means that he must sell it to somebody, correct?

12  A       Correct.

13  Q       Okay.  Who did he sell it to?

14  A       There were informants, local informants, through

15  Galveston PD and through Galveston County, that advised that

16  he was selling street-level narcotics.  Selling a gram here,

17  seven grams here; street-level quantities.

18  Q       Is that in your report?

19  A       I'm not sure if there is.

20  Q       Now I can represent to you I skimmed it last time I

21  was here.  I don't recall any reports about him selling any

22  narcotics to anybody.

23  A       Correct.

24  Q       Well, which one is it?  Is there a report discussing

25  that or is there not?

1   A      I just said there was not.

2   Q      There was not?

3   A      No.

4   Q      Okay.  So, to be fair and clear, as we sit here today

5   you know he purchased five-ounces of methamphetamine but you

6   don't know if he sold it or did what with it?

7   A      How would he get the money?  It's best to assume he

8   did sell it to obtain --

9   Q      You're asking a question --

10  A      Okay.

11  Q      -- but I'm asking you to answer my question.  You

12  don't --

13  A      Okay.  Can you repeat it?

14  Q      Sure.  You don't know what he did with the five-ounces

15  of the methamphetamine, do you?

16  A      No, I don't.

17  Q      Okay.

18  A      No.

19  Q      Now could somebody use five-ounces of methamphetamine?

20  A      They could.  It's not plausible, but, yes, they could.

21  Q      All right.  Let's talk about the search.  As I

22  understand it correctly, and correct me if I'm wrong,

23  Mr. Reyna, the day of the search, was leaving a trailer; is

24  that what you said?

25  A      Correct.

1   Q      What was the address of the trailer?  Where is it

2   located?

3   A      1818 Main Street.

4   Q      1818 Main Street?

5   A      Correct.

6   Q      And that's in Galveston, Texas?

7   A      La Marque, Texas.

8   Q      La Marque, Texas.  Okay.  And were you there when the

9   search occurred?

10  A      No.

11  Q      Okay.  Who conducted the search?

12  A      I'd have to go back to my notes, but off the top of my

13  head, it was Special Lee Erickson with HSI, Detective Roark

14  with GPD, Detective Garcia, Detective Gross also with GPD,

15  Detective Corbett UTB PD, Officer Patten with K-9 with GPD

16  and I may be leaving someone out, but there's --

17  Q      Approximately ten individuals?

18  A      Yes.

19  Q      Okay.  And all these -- all the ten individuals were

20  there in order to execute an arrest warrant on Mr. Reyna?

21  A      Correct.

22  Q      Now was Mr. Reyna located in the trailer when the

23  arrest occurred?

24  A      He was located outside the trailer.  He was coming

25  out.

1   Q      He was outside the trailer?  Where was he outside the

2   trailer?

3   A      You're asking me questions that I wasn't there.

4   Q      I know but you're the only one I got.

5   A      Okay.

6   Q      Do you know, to your knowledge, do you know where he

7   was?

8   A      I believe he was outside the trailer.  They got him as

9   he was walking to his car.

10  Q      So they saw him walking outside of the trailer to his

11  car, the black Charger --

12  A      Yeah.

13  Q      -- and then they executed their arrest warrant?

14  A      That I know of, yes.

15  Q      Okay.  Did you have a search warrant?

16  A      No.

17  Q      Did they search the house?

18  A      Yes.

19  Q      The trailer?

20  A      Yes.

21  Q      And was the search -- was there -- you know how we

22  talked there was some fancy airplane surveillance that had

23  Mr. Hinojosa and had the CRV.  Do you remember testifying

24  about that?

25  A      Yes, sir.

JAMES EMERSON - CROSS BY MR. FAZEL                    71

1  Q      Was that fancy surveillance also going on when the

2  search occurred?

3  A      No, it's not needed.

4  Q      They didn't have that?

5  A      It's not needed, no.

6  Q      It's not needed?

7  A      Correct.

8  Q      Okay.  I see.  And so when they came up to the trailer

9  -- was he arrested and then they went to the trailer?

10 A      Like I said, I -- to the best of my knowledge, yes,

11 they -- they went up to him; he was coming out to the

12 Charger.  I think he was leaving to go get breakfast

13 randomly and then they placed him under arrest.

14 Q      Okay.  Did he fight?

15 A      Not that I know, I wasn't there.

16 Q      Was there a shootout?

17 A      No, there wasn't.

18 Q      You would know if there was a shootout?

19 A      Oh, yeah, I would know if there was a shootout.

20 Q      You'd know if you pulled a gun out?

21 A      Yes, definitely.

22 Q      All right.  In Galveston, it's probably not a good

23 idea?

24 A      Yeah.

25 Q      Okay.  So there was no shooting.  He was under arrest

1  and then they searched the trailer, right?

2  A    Yes.

3  Q    Who was in the trailer?

4  A    I believe, Emily, and I believe, there was a cousin.

5  Q    Just two people?

6  A    I guess.  I wasn't there so I'm sorry, I can't --

7  Q    And who gave them permission to search?

8  A    I don't know.

9  Q    Did they have a reason to search?

10 A    Yes.

11 Q    How do you know that?

12 A    That's what I was told.

13 Q    Who told you that?

14 A    Detective Roark.

15 Q    Detective Work?

16 A    Roark.

17 Q    W-O-R-K?

18 A    No, R-O-A-R-K.

19 Q    Roark?

20 A    Yeah.

21 Q    I see.  And did Detective Roark tell you who he got

22 permission from?

23 A    No.

24 Q    Did Detective Roark tell you if he -- if he knocked on

25 the door, somebody came out, got permission, if he entered

1  the place; do you know?

2  A      He said, he knocked on the door.  Emily was standing

3  there, the cousin, which I don't know his name, was standing

4  in the hallway and he saw Roark.  He took off running, ran

5  into one of the bedrooms.  Roark entered through exigent

6  circumstances.  Chased him into the bedroom, detained him.

7  He said his hand was under the pillow.  When he moved the

8  pillow, there was pistol under there.

9       He said, he thought he was -- again, this is what

10 Detective Roark told me.  That the cousin said that he

11 didn't know he was a police officer.  He thought there --

12 somebody was coming there to jack them, rob them.  That's

13 why he was going for the gun.

14 Q      Okay.  And, so that I understand your description, I

15 just want to understand the circumstances.  He knocked on

16 the door of the trailer?

17 A      Correct.

18 Q      Somebody opened the door?

19 A      He -- no.  He said, it was already partially open.

20 Q      Partially open?

21 A      Yes.

22 Q      The door just, err [makes noise], opened up?

23 A      Yeah, because Daniel had just come out.

24 Q      Daniel had just come out?

25 A      Yes.

1  Q      And he saw two people sitting there?

2  A      Again, this is exactly what -- this is what I was told

3  so I'm --

4  Q      Fair enough.

5  A      -- I wasn't there.

6  Q      And the person saw Detective Roark, right?

7  A      Again, what I was told, yes.

8  Q      Right.  And then Detective Roark, I'm assuming, has,

9  you know, police all over him and all that?

10        (Crosstalk.)

11 A      That -- yes.  So a bright vest, all that.

12 Q      Yeah, okay.  And so the guy took off running?

13 A      Correct.

14 Q      Okay.  And that's the exigent circumstances?

15 A      Correct.  It -- it's --

16 Q      The guy taking off running is the exigent

17 circumstances?

18 A      Yeah, you've got to look at the totality of the

19 circumstances.

20 Q      No, no, no, I got it.

21 A      Okay.

22 Q      I'm not asking for a legal definition.  We'll get

23 there later.

24 A      Okay.

25 Q      I'm just asking you that's the exigent circumstances?

1   A      If -- if I was there and that's exactly what I saw,

2   yes, that is definitely exigent circumstances.

3   Q      Okay.  Did you have -- prior to your executing the

4   search warrant, excuse me, the arrest warrant, were you

5   aware that Daniel had any guns in the house?

6   A      No.  Not proof that he had guns in the house.

7   Q      Were you aware that Daniel had any drugs in the house?

8   A      No.

9   Q      When did the consensual search occur?  What date?

10  A      The day that he was arrested; July 10th.

11  Q      When was the last time in your -- if you can recall,

12  that you had Title III information that Daniel had purchased

13  any kind of drugs?

14  A      You're asking me a very specific question and I'd have

15  to --

16  Q      I know.  How about month?

17  A      -- I'd have to go back and look at the T-III --

18  Q      Would November be correct?

19  A      Yes.

20  Q      So from November to -- did you say the --

21  A      July 10th.

22  Q      July; I'm bad at math.

23  A      (Laughs.)

24  Q      December, January --

25  A      Seven months.

1  Q     -- February, March, April, May, June, July.  That's

2  eight months?

3  A     Eight months.

4  Q     Eight months later, you execute an arrest warrant and

5  then you enter the home based on information obtained eight

6  months ago, correct?

7  A     No.

8  Q     No.

9  A     No.

10 Q     What other information did you have past November?

11 A     You said I entered the home.  I did not enter the

12 home.  I was not there, but --

13 Q     Officers entered the home?

14 A     Okay, yes.

15 Q     Is that correct?

16 A     Yes.

17 Q     And you had no other information for that eight-month

18 period that the investigation was going on?

19        MR. KHANDELWAL:  Objection, Your Honor.  This is

20 going beyond the scope of probable cause.

21        THE COURT:  Yeah.

22        MR. KHANDELWAL:  This is going --

23        THE COURT:  I mean, it really is.  I guess, if

24 we're going to have a suppression hearing we can do it,

25 but.

1          MR. FAZEL:  Yes, sir, yes, sir.  I'll move on,

2  Judge.

3          THE COURT:  Although we weren't dealing with

4  probable cause.  We're dealing with detention.  So it might

5  make a little bit of a difference.

6          MR. FAZEL:  I pass the witness, Your Honor.

7          THE COURT:  Well, I didn't mean for you to give

8  up.

9          Let's go -- let's -- let's -- John, you're next

10  on my list so.

11              CROSS-EXAMINATION OF JAMES EMERSON

12  BY MR. FRIESELL:

13  Q     I have some questions about Israel Sanchez?

14  A     Yes, sir.

15  Q     Where was Mr. Sanchez arrested?

16  A     I believe it was an apartment complex, 3500 Baker, I

17  can't remember the exact apartment number.

18  Q     Right.  And that's where he was living?

19  A     I believe so.  I'm not -- I can't tell you if he was

20  living there or if that was the place he was staying.

21  Q     Right.  Was there a search conducted of the residence

22  when he was arrested?

23  A     I believe so, but I'm not sure.

24  Q     Okay.  Was there -- was there a search warrant?

25  A     No, there was not.  Just the arrest warrant.

1   Q     Did Mr. Sanchez resist arrest?

2   A     No.  Not that I'm aware of.

3   Q     Did he -- were any guns founds?

4   A     No.

5   Q     Were any drugs found --

6   A     No.

7   Q     -- in connection with him?

8   A     No.

9   Q     Any large amount of money?

10  A     No.

11  Q     Does Mr. Sanchez have any prior arrests?

12  A     He has misdemeanor arrests but I don't -- there's

13  nothing that I recall that stands out.

14  Q     He has a miss -- I'm sorry?

15  A     He has misdemeanor arrests; nothing that stands out

16  though.  Nothing violent or extreme.

17  Q     Does he have any prior convictions?

18  A     I believe so.

19  Q     What is that for?

20  A     I'd have to look at his criminal history.  I don't --

21  I don't have it memorized.

22  Q     If there was a search of the federal, state and local

23  records that showed that he did not have any prior

24  convictions, would you disagree with that?

25  A     Yes.  There should be a misdemeanor.  I think -- I

1  think there's, at least, a public intoxication conviction.

2  Q     Is it possible that that's a juvenile?

3  A     I don't know.  I'd have to look.  If you could get me

4  a copy of his criminal history, I could tell you what

5  percent.

6  Q     How old is Mr. Sanchez?

7  A     Again, I don't -- I don't have their ages memorized.

8  I know he's maybe 20.

9  Q     All right.  I had some questions about the attempt to

10 pick up nine-kilos --

11 A     Uh-huh.

12 Q     -- of methamphetamines.

13 A     Yes, sir.

14 Q     Was -- the information you were gathering about that,

15 was that based solely on Title III?

16 A     Correct.  Yes, sir.

17 Q     Were there any meetings between Mr. Sanchez and the

18 informant?

19 A     No, sir.

20 Q     Did you ever meet with Mr. Sanchez during the course

21 of your investigation?

22 A     No, sir.  I never did.

23 Q     And I believe you were talking about there was an

24 additional plan to pick up methamphetamine in McAllen?

25 A     Yes, sir.

1    Q      Okay.  What -- what happened to that?

2    A      It never went through.  I don't know what happened.  I

3    don't know if Robby couldn't get the -- wasn't able to

4    obtain it or if they just backed out, but it just -- it

5    never went through.

6    Q      So you don't know why?

7    A      No, I don't know why.

8    Q      Was there any phone calls or any Title III wiretaps

9    about that transaction?

10   A      Yes, sir.

11   Q      Were there any explanation in those -- discussion in

12   those wiretaps about the deal falling through?

13   A      There were discussions about Robin had crossed over

14   into Mexico, he came back, the guy he was getting it from,

15   something he wasn't able to get it at that time and he just

16   is, like most, typical larger drug deals, it just fell

17   through.

18   Q      So the source was unable to provide the

19   methamphetamine that was to be picked up by this

20   organization?

21   A      I believe so.

22   Q      After the McAllen deal fell through, you said there

23   were two individuals that were in Mexico City that were in

24   discussions with?

25   A      There was never really any clarification on where they

1  exactly were.  I know Sebastian had referenced he was in

2  Mexico City and Victor -- the reason we say Guadalajara is

3  because he had said he was over there with Abel's dad and

4  there was calls before where his dad, which is Nino, Sr.,

5  said he lived in Guadalajara.  So that's why we assumed

6  Victor was in Guadalajara and Sebastian was in Mexico City.

7  Q      And so Sebastian and Victor were basically supposed to

8  be the source of methamphetamine to be picked up?

9  A      Yes.  I believe Sebastian was more of like the broker

10 and Victor was definitely the source.  He was with the Silva

11 Cartel.

12 Q      With what Cartel?

13 A      The Silva.

14 Q      Now have these two individual- -- has Sebastian been

15 identified?

16 A      No.  Later they were then identified.

17 Q      Okay.  So Sebastian has not been identified?

18 A      Not to my knowledge, no.

19 Q      Has Victor been identified?

20 A      No.

21 Q      When you say that Victor was associated with the

22 Cartel, what was that based on?

23 A      Photo analysis.

24 Q      And analysis of things that were said?

25 A      No.  Photo analysis of Sebastian -- I mean, of

1   Victor's phone; his actual cell phone.

2   Q      Okay.  But Victor hasn't been identified as the

3   individual?

4   A      Not that I'm aware of; he has not.  He's an

5   individual, but we haven't identified his full identity.

6   Q      Okay.  When you said Victor was the source -- you were

7   saying Victor was the source of this methamphetamine?

8   A      Yes, sir.

9   Q      Why do you say he's the source?

10  A      That's who Abel was communicating with.  He's the guy

11  who said he would provide him the nine-kilos of meth.

12  Q      Okay.  Now was he saying that he had those nine-kilos

13  or he would obtain them?

14  A      I mean when we get down to specifics because there was

15  -- there was thousands of phone calls, I'd have to refer --

16  I'd have to actually refer back to the call and tell you

17  exactly what was said.

18  Q      Were there any phone calls that you're aware of,

19  between Victor and Mr. Sanchez?

20  A      No.

21  Q      Was there any phone calls that you're aware of,

22  between Sebastian and Mr. Sanchez?

23  A      No, sir.

24  Q      You'd also discussed some money that was wired in

25  connection with the trip?

1    A      Yes, sir.

2    Q      Who was that money wired to?

3    A      Abel Hinojosa.

4    Q      And who was that money wired from?

5    A      I think it was Reynaldo Escobar.  I'm not 100 percent.

6    It's in the reports.

7    Q      And was that money wired before Mr. Sanchez left for

8    the Houston/Galveston area?

9    A      Yes, sir.

10   Q      And was it given to Mr. Sanchez?

11   A      I believe so.

12   Q      And when you say you believe so, what are you basing

13   that on?

14   A      From the Title III intercepts.

15   Q      Okay.  Phone conversations?

16   A      Correct.  Between Abel and Israel.

17   Q      And what was your understanding of what that money was

18   for?

19   A      Pay for expenses, gas, lodging, food for the trip down

20   to Guadalajara.

21   Q      Okay.  You based that on the phone conversations also?

22   A      Correct.

23   Q      How many -- these phone conversations are Title III

24   wiretap phone conversations, correct?

25   A      Yes, sir.

1    Q      Okay.  How many phone calls do you have for

2    Mr. Sanchez only?

3    A      Again, when you ask like specific numbers, I can't

4    tell you off the top of my head.  I'd have to go back and

5    look.  See how many -- how many calls.

6    Q      Well, is it less than 50?

7    A      Again, I'd have to -- I don't know, I'm sorry.

8    There's a lot.

9    Q      There are?

10   A      Yeah, there's a lot.

11   Q      You're saying there is a lot?

12   A      Yeah, there's a lot.

13   Q      In over what period of time?

14   A      Let's see the first intercept was in September till

15   November, I believe.

16   Q      So over a three-month period?

17   A      Correct.

18   Q      Now Mr. Sanchez, once he got to -- what happened --

19   did he get across the United States/Mexican border?

20   A      Yes.

21   Q      And how did you verify that he did cross the border?

22   A      Through texts; through database with Immigration

23   Customs Enforcement.

24   Q      So there's a record with the border patrol that he

25   passed through the border?

1    A       That he came back across, correct.

2    Q       The -- okay.  That he came back?

3    A       Correct.

4    Q       Okay.  And what happened once he got into Mexico?  Why

5    didn't he proceed further?

6    A       Based on the calls, when he called Abel.  He said he

7    didn't have his passport.  I forgot the amount, I think it

8    was $2,000, they were requiring, which it may have just been

9    corrupt police for him to get a permit to go further into

10   Mexico.

11   Q       Okay.  So that -- that information, though, is based

12   on the wiretap?

13   A       Correct.  Just the wiretap.

14   Q       Were there any -- was there any surveillance of

15   Mr. Sanchez?

16   A       No, sir.

17   Q       Was there an informant that was assisting you in the

18   investigation that saw Mr. Sanchez once he was in the border

19   area?

20   A       No, sir.

21   Q       And, I believe you said that Hinojosa and Ventura were

22   having trouble contacting Mr. Sanchez, but what do you base

23   that on?

24   A       The phone calls.  Abel would call Nelson.  They would

25   ask -- he would ask have you been able to talk to him, get

1    hold of him?  He says no.  Neither were able to get hold of

2    him.  It was because -- Israel said, later on, his cell

3    phone wasn't working over there, on that side, in Mexico.

4    Q     Okay.  So the reason given for not be able to contact

5    Mr. Sanchez was because the cell phone wasn't working in

6    Mexico?

7    A     I believe so.  That's what Israel said.

8    Q     Okay.  Do you know why that would be?  Do you know if

9    that's a possibility?

10   A     It's a possibility, yes.

11   Q     Is it something you've experienced before?

12   A     No.

13   Q     Does it seem like something that you think really

14   happened or do you think that --

15   A     Yes.  Once you get in Mexico, I mean if you get

16   farther in, you're far away from the U.S. cell towers, U.S.-

17   based cell towers.

18   Q     Okay.  The -- do the border patrol records reflect

19   whether or not Mr. Sanchez had a passport with him when he

20   crossed the border?

21   A     I'm sure it would reflect.  I don't know what it says.

22   Q     And how long was he there on the Mexico-side border?

23   A     I believe, it's just a day.  He stayed the night with

24   his mom in Rio Bravo.

25   Q     Okay.  And his mother and father live in Mexico?

1   A      Based on the call he said his family was there, in Rio

2   Bravo.

3   Q      Okay.  Now you had some phone call where there was a

4   reference to slingshots?

5   A      Yes, sir.

6   Q      Okay.  And what do you believe that phone call was

7   about?

8   A      Guns.  Slingshots refer to gun -- is a term for guns.

9   Q      And why do you believe that that refers to guns?

10  A      Previous calls between Abel and his father, Nino.

11  Q      They would use the same term?

12  A      Correct.

13  Q      Do you have any phone calls between Mr. Sanchez and

14  Mr. Hinojosa talking -- using that term?

15  A      No.

16  Q      Just that one?

17  A      Correct.

18  Q      Were any guns found in that vehicle?

19  A      No.

20  Q      Do you know what type of guns those were supposed to

21  be?

22  A      Like I said I believe it would be a Glock, a single

23  Glock.  Just one Glock handgun.

24  Q      Okay.  A single?

25  A      Just based on the previous calls because he -- Abel

1   had a call with his father, Nino, and he told him -- I think

2   he had some -- some guy here that could supply him with the

3   pre-etas, which mean black.  And, then he said the kind the

4   cops use.  And, a lot of cops use Glock handguns that are

5   black.  So that's why I believe they were -- it was a Glock.

6   Q     But you believe it was a single?

7   A     Yes.  Because his dad did say, just send one of them

8   and he would show it and see if they wanted it.  Show them

9   as in the Cartel.

10  Q     Okay.  None of those guns were seized?

11  A     No.

12  Q     And do you have any teletype conversations where

13  Mr. Sanchez is talking about guns?

14  A     No.

15  Q     Other than the Title III wiretap phone calls, do you

16  have any information about what Mr. Sanchez was doing on the

17  Mexican side of the border?

18  A     No, just the Title III's.

19  Q     Were there any phone calls, Title III phone calls that

20  were intercepted between any of the Co-Defendants for

21  Sebastian or Victor during the time that Mr. Sanchez was in

22  Mexico?

23  A     All of it with Abel.

24            THE COURT:  Let me stop you there.  There's been

25  a request to take a break from some of the Defendants.  So

1  why don't we stand in recess for about ten minutes,

2  15 minutes maybe; about 15 minutes.

3           (Recess taken from 3:19 p.m. to 3:33 p.m.)

4                MR. FRIESELL:  Your Honor, I just have a couple

5  more questions.

6                THE COURT:  Sure, whatever.

7                CROSS-EXAMINATION OF JAMES EMERSON

8  BY MR. FRIESELL:

9  Q     Mr. Sanchez was supposedly going to Mexico to pick up

10 this nine-kilos and this was supposedly Guadalajara,

11 correct?

12 A     Yes, sir.

13 Q     And have any of the drugs involved in this case been

14 identified as being from Mexico?  Provided by a source in

15 Mexico?

16 A     What specifically are you talking about, the drugs

17 that I bought?

18 Q     Well, any of the drugs involved in this conspiracy.

19 A     The ones that I bought I can't prove where they came

20 from, no.

21 Q     Are there -- do you know of any drugs in this

22 conspiracy that were obtained from Mexico; a source in

23 Mexico?

24 A     I can't prove it, but, other than the purity;

25 97 percent purity is about as high as you can get in the

JAMES EMERSON - CROSS BY MR. FRIESELL                    90

1  United States.

2  Q     And what -- that makes you think what?

3  A     If it's 97 percent purity, it's coming directly from

4  the super lab in Mexico.

5  Q     Why does it -- why do you believe that?

6  A     Other than the TV show *Breaking Bad*, there's not many

7  people in the U.S. that can produce methamphetamine of that

8  quality unless it's a super lab, which they have plenty of

9  in Mexico.

10 Q     So it's the purity that makes you think some of this

11 might have been from Mexico?

12 A     Correct.  Usually if it enters the U.S., it'll pass

13 hands, they're going to step on it, dilute it, add cutting

14 agents to decrease the purity, but increase the quantity and

15 the fact that it -- none of that happened.  It was

16 97 percent.  It means it didn't pass through many hands to

17 go from the source to Abel.

18 Q     Now the Sebastian and Victor that are on these Title

19 III's, are they only in reference to this one transaction

20 regarding the nine-kilos?

21 A     Correct.

22 Q     Okay.  And then when that deal falls through, were

23 there any phone calls about it?

24 A     I believe the -- around that time was when the wire

25 went down.  The 30-day order expired.

1   Q      Okay.  And do you know the total amount of

2   methamphetamine that is involved in this conspiracy?

3   A      Seized or involved?

4   Q      Involved.

5   A      Over 20-kilos.

6   Q      Okay.  How much was seized?

7   A      Three and-a-half kilos.

8           MR. FRIESELL:  We'll pass the witness, Your

9   Honor.

10          THE COURT:  David, I don't know that you've got a

11  liberty interest, but I'll let you ask any questions while

12  you're here.

13          MR. ADLER:  Okay.  Thanks.  I've just have a few

14  questions.

15          THE COURT:  Sure.  Whatever.

16              CROSS-EXAMINATION OF JAMES EMERSON

17  BY MR. ADLER:

18  Q      Officer Emerson?

19  A      Yes, sir.

20  Q      Are you -- you're the only witness, I think the

21  Government is going to put up today, correct?

22  A      Correct.

23  Q      Okay.  So the Judge's decision today is going to be

24  based on your credibility, obviously?

25  A      Yes, sir.

1   Q      So I have to ask, have you had any kind of misconduct

2   issues or disciplinary issues in your law enforcement

3   career?

4   A      Yes, sir.

5   Q      Okay.  Can you tell us about those?

6   A      Not filling out my -- back when I was on patrol, not

7   filling out my gas unit in time.

8   Q      Pretty minor?

9   A      Yeah, minor stuff.

10  Q      Anything else other than that one?

11  A      No.

12  Q      You said -- I just want to make sure, though, that you

13  don't know the reason for the stop of the Honda that

14  Mr. Perez was driving?

15  A      I could tell you if I could look at the Montgomery

16  County report.

17  Q      Well, actually what reports have you looked at in

18  preparation for today?

19  A      Well, I've looked at them.  I just don't have them

20  memorized.

21          MR. ADLER:  Okay.  Judge, I'd ask -- I don't

22  think we need to continue this --

23          THE COURT:  Sure.

24          MR. ADLER:  -- but I'd just ask the Government to

25  agree to make those items that he looked available to us as

1  well.

2           MR. KHANDELWAL:  And, Your Honor, we will make

3  full discovery at that end.

4           THE COURT:  Okay.  Yeah, no problem.

5  BY MR. ADLER:

6  Q     When he was stopped, were any guns found in the

7  vehicle?

8  A     With Rodolfo?

9  Q     Yeah.

10  A     No.

11  Q     Any large amounts of cash?

12  A     No.

13  Q     Did he try to flee?

14  A     No.

15  Q     Was he cooperative?

16  A     I'd have to refer to the report, but I believe that he

17  wasn't fighting or nothing like that.

18  Q     And I think you said he gave a statement?  That's

19  really what I was getting to.

20  A     Yes.

21  Q     He was cooperative in the sense that you guys -- you

22  asked him questions or some officer had asked him questions?

23  A     Not -- yeah, not myself, but, yes, the deputies there.

24  Q     And I think you said that's when he said something

25  about he was going to be paid thousands, $5,000?

JAMES EMERSON - CROSS BY MR. ADLER                    94

1  A      Five -- yeah, $5,000 to $6,000.

2  Q      Okay.  And with all your years of experience in law

3  enforcement, couriers are low-level people in these

4  operations?

5  A      Yeah.  They're just -- they're just drivers.

6  Q      Yeah.  They don't have authority to make decisions

7  about anything?

8  A      Typically, no.

9  Q      They don't have the ability to manage or control other

10 people?

11 A      No.

12 Q      They basically --

13 A      They're -- they're at the bottom.

14 Q      Is there somebody lower than a courier?

15 A      No.  Not in a conspiracy.

16 Q      Okay.

17 A      Really isn't.

18 Q      When you said that -- Mr. Fazel was asking you about

19 where the drugs came from --

20         MR. FRIESELL:  Friesell.

21         MR. ADLER:  Friesell.

22 BY MR. ADLER:

23 Q      I'm sorry, Mr. Friesell, you're basing that on purity

24 of the drugs and nothing else?

25 A      The drugs that we seized, yes.

1  Q      Okay.

2  A      The drugs, in total, no.  The Title III wire incepts

3  is what we're basing --

4  Q      Yeah, the seized?

5  A      But the one seized?  Yes, we're basing it just on the

6  purity.

7  Q      And when you were talking about a "super lab," I think

8  was the term you used?

9  A      Correct.

10 Q      Obviously, if you or the other officers knew about the

11 location of the super lab, it would be taken down; fair to

12 say?

13 A      Depending on what the Mexican government would do.

14 Q      I mean in the U.S., I'm sorry.

15 A      Oh, yes.  If there -- definitely.  If there was any

16 location in the U.S. it would be.

17 Q      So really you don't know if these drugs that actually

18 came in this purity from the United States?

19 A      Oh, I never said that I know for sure.  I just said we

20 believe that it came from Mexico based on --

21 Q      But it -- but it is possible it came from the U.S.?

22 A      Oh, it is.  I mean, some got there.

23 Q      And the seizure -- the vehicle stop and the seizure

24 from Mr. Perez, he's already been charged with that offense

25 in state court, right?

1    A       Yes.

2    Q       And he pleaded guilty to that, once, in state court?

3    A       Yes.

4    Q       And he received a 15-year sentence for that offense in

5    state court?

6    A       Yes.

7    Q       And now, he's charged with the very same thing in this

8    court?

9    A       Well, that's superseded on, yes.

10   Q       Well, it's actually a different case.  It's not a

11   superseding Indictment.

12   A       Oh.

13   Q       That was a state case, right?

14   A       Yes, that was a state case.

15   Q       And so the very same conduct which he's currently

16   serving a 15-year prison sentence for is the same conduct

17   that he's charged with in this case?

18   A       Yes, he's being charged with this conspiracy.

19   Q       Nothing new, nothing different?

20   A       Just the conspiracy.

21   Q       Well, what else did he do in the conspiracy other than

22   drive this car?

23   A       He's part of the conspiracy and then the three kilos

24   of meth that was in the car.

25   Q       Yeah, that's what I'm saying.  Other than driving the

1  car that he was stopped in, what information do you have

2  that he did something else?

3  A    No, that's it, that's it.  Just the courier.

4           MR. ADLER:  That's all I have, Judge.

5           THE COURT:  Okay.

6           Anything else from the witness?

7           MR. KHANDELWAL:  Nothing further, Your Honor.

8           THE COURT:  All right.  Yeah, I don't have any

9  questions.  So you can step down.  Thank you.

10          THE WITNESS:  Thank you.

11      (Witness steps down.)

12          THE COURT:  Your next witness?

13          MR. KHANDELWAL:  No further witnesses, Your

14  Honor.  The Government rests.

15          THE COURT:  All right.  Any evidence on behalf of

16  Mr. Hinojosa?

17          MR. ROBINSON:  Yes, Your Honor.  At this time we

18  would like to call Ms. Lucia Hinojosa -- or, Judge, I

19  proffer -- we did intend for her to testify --

20          THE COURT:  It's your call.  I don't care.  I

21  mean, I don't care.  Whatever you want to do.

22          MR. ROBINSON:  All right.  Judge, Ms. Hinojosa is

23  Abel Hinojosa's mother.  Herself, Abel's wife, Goleta

24  (phonetic), and Abel and Goleta's three children live in the

25  home that's described in the Pretrial Services Report in La

1  Marque.  Ms. Hinojosa will tell you that Abel is the father

2  of those three children who are U.S. citizens.  She'll tell

3  you that Abel is a U.S. citizen, himself.  That he has -- he

4  does have a U.S. Passport.  She'll tell you that Abel and

5  his wife, and I believe you heard evidence from Officer

6  Emerson, during his direct testimony, that he has a job here

7  in the United States, along with his wife.  They are reps

8  for an internet sales product company called Oregano, so he

9  is employed.

10            You have heard that, prior to this investigation

11  and prior to May of this year, Mr. Hinojosa has no prior

12  arrests and zero criminal history.  She will also tell you

13  that, to her knowledge, the prior arrest in May of this

14  year, that case has not been indicted by that county.

15            She will, finally, tell you, Judge, that although

16  he does have siblings and three children or two children

17  from his prior marriage that live in Mexico, he has had no

18  visitation with any of them in over four years.  He has not

19  been to the country of Mexico in over four years, Judge, and

20  that would be the basis of her testimony today.

21            THE COURT:  All right.  Anything else?

22            MR. ROBINSON:  That's it, Judge.

23            THE COURT:  Okay.  Any evidence from Mr. Ventura?

24            MR. SALINAS:  Yes, Judge.  I would proffer that

25  Mr. Ventura came to the United States in 1989; he's a

1   resident alien, one of nine children born to his mother and

2   father.  He lives here in Galveston, his family lives here

3   in Galveston.  He's got a brother named Hector Ventura who

4   is actually the owner of Ventura Auto Sales.  He's the

5   United States citizen.

6          Mr. Nelson Ventura also has a common-law wife for

7   the past 22 years.  They have three children that are U.S.

8   citizens.  His common-law wife is a U.S. citizen.  Nelson

9   Ventura has been an employee of Ventura Auto Sales for eight

10  years.  Has no prior criminal history.  The only time that

11  he left the United States was in 2004 to attend his

12  grandfather's funeral in El Salvador.

13         His family has stable employment and several

14  assets that they would be willing to post as bond for him

15  and I would ask the Court to fashion some sort of bond even

16  with home monitoring and that his family, who is all here in

17  Galveston, would make sure that he shows up for any and all

18  court appearances.

19         And, again, Judge, he has no prior criminal

20  history.

21         THE COURT:  All right.  Sure.

22         Mr. Reyna?

23         MR. FAZEL:  If it pleases the Court, Your Honor,

24  we have four individuals and I've explained it to the family

25  and Mr. Reyna that this is a presumption case.

1            THE COURT:  Sure.

2            MR. FAZEL:  And I know the Court is aware of

3    Mr. Reyna's criminal history.  What I'd like to do is just

4    proffer, briefly, the witnesses that are willing to sign on

5    a bond should the Court decide to fashion a bond for

6    Mr. Reyna which I would ask the Court to do.

7            The first is Maria, excuse me, Marie Salinas,

8    which is his grandmother, who lives in Galveston; Debbie

9    Reeder, Glenn Reeder and Terri Scott.  Debbie Reeder is a

10   Houstonian who lives in the Sugar Land area.  Glenn Reeder

11   is a Houstonian who lives in the Sugar Land area; of course,

12   they're husband and wife.  Ms. Reeder is a bookkeeper.

13   Mr. Reeder is a designer.  And, Mr. Scott is a retired

14   military individual who lives in the Houston area as well.

15           All these folks are willing to sign on a surety.

16   I had faxed this information to Pretrial Services yesterday.

17   We got it kind of late.  So I don't think they were able to

18   amend the Pretrial Services to the Court to indicate that,

19   but they're all willing to sign on a surety to allow the

20   Court to have some comfort that he is not going to be a

21   flight risk or a danger to the community or fashion as the

22   Court wishes.

23           I think the Court also should take into

24   consideration the fact that the evidence shows, at best,

25   that perhaps it was a possession-type case.

1          Again, I understand that he's charged with a

2    conspiracy and a presumption case, but I want the Court to

3    be aware that there are individuals in the community that

4    are willing to a surety if the Court wishes to allow for

5    that and to allow Mr. Reyna to be out on bond while the case

6    is pending.  Thank you.

7          THE COURT:  All right.

8          Mr. Sanchez?

9          MR. FRIESELL:  Your Honor, I proffer that

10    Mr. Sanchez is 20 years old.  He's a United States citizen.

11    He does not, from the Pretrial Services Report, have any

12    prior criminal record.  He is employed as a welder and he

13    does believe he can return to work if he were released on

14    bond.

15          And, also, in this case, he does not present

16    continuing danger to the community if released on bond, the

17    alleged drug trafficking, because even assuming the evidence

18    is true, he's a courier and doesn't have the capability of

19    obtaining large amounts of drugs.  He was just assuming the

20    truth of the evidence that the Government presented, was

21    told where to go to pick drugs up.  So, he doesn't present a

22    continuing danger to the community if released on bond of

23    this continuing offense.

24          THE COURT:  Uh-huh.  Anything the Government

25    wants to say before we close the Record?

1           MR. KHANDELWAL:  Yes, Your Honor.  This is a

2    presumption case in Court as, of course, we're all aware.

3    We believe that each of these Defendants should be held.

4    The evidence against these Defendants is overwhelming and

5    clear and will be during the probable cause hearing and, of

6    course, as well.

7           In terms of the personal characteristics of each

8    of the particular Defendants, let me begin with

9    Mr. Hinojosa.  He, of course, is the leader of -- one of the

10   leaders of this conspiracy.  He, of course, has family in

11   Mexico, he has -- he's in possession of the U.S. Passport or

12   was, at least, he was also planning to fly to Mexico during

13   the course of this conspiracy.  That gives us a grave

14   concern that he is a flight risk.  We've also talked a lot

15   about that he was trying to send big guns to Mexico.  That

16   gives us a reason to fear about the personal -- a risk to

17   the safety of the community as well.  We just don't think

18   that he can -- to overcome presumption in this case.

19          With respect to Mr. Ventura, again, he is another

20   role -- he's another leader in this conspiracy and there's

21   also, with him, as we've revealed on cross-examination,

22   discussions about having possession of guns as well and

23   this, of course, is of great concern.  He is a citizen of

24   another country and possesses a severe flight risk for that

25   reason.  He also has a current substance abuse as reflected

1   on the PSA report.  Given those things, Your Honor, we would

2   ask that he be held as well.

3            With respect to Mr. Reyna, he, of course, has an

4   aggravated robbery from 2006, found with multiple weapons

5   including two mini machine guns, 1,000 rounds of ammunition

6   and an ounce of meth -- half an ounce of methamphetamines.

7   We believe he is a very clear case of somebody who needs to

8   be held.

9            And, with respect to Mr. Sanchez, he also -- he

10  admitted cocaine use in his Pretrial Services Report; he has

11  a lack of any real financial ties to our community.

12           And, again, the evidence revealed that he does

13  pose a danger.  He was trying to move guns to Mexico and was

14  involved in that as well.

15           Given all the evidence here, we just don't think

16  that any of the Defendants has overcome the presumption that

17  applies in this case.

18           THE COURT:  Any further arguments from anybody on

19  this side?

20           MR. ROBINSON:  Yes, Judge.  I would counter to

21  what the AUSA has stated on Mr. Hinojosa.  He is not a

22  flight risk, Judge.  Again, the family has his passport

23  here.  The Judge -- if the Court would ask that he be

24  willing to relinquish that passport.  He would also be

25  willing to wear an ankle monitor if the Court were to allow

1   him to be released today.

2           Prior to going into employment with this company,

3   Oregano, Mr. Hinojosa worked as a mechanic and a welder and

4   I believe he could be a normal citizen, Judge; someone who

5   can contribute to his community and to his family.  In that

6   regard, he could take care of them while waiting disposition

7   of this case.

8           We do not believe he's a flight risk.  Again,

9   we'd like to reiterate, he has not made any attempts to

10  leave the country in the past four years.  And, we ask that

11  if the Court were to allow that he be released today with

12  his family either on bond or ankle monitor as the Court sees

13  fit.

14          THE COURT:  Okay.

15          MR. KHANDELWAL:  Your Honor, if I could respond

16  to that very briefly?

17          THE COURT:  Sure.

18          MR. KHANDELWAL:  The evidence, in this case,

19  actually was that he was trying to fly to Mexico during the

20  course of this conspiracy.

21          THE COURT:  Sure.  I know.  So --

22          MR. KHANDELWAL:  He has family in Mexico and his

23  wife does not have any legal immigration status in the

24  United States.  We think he does pose a significant flight

25  risk, given the fact that he is now facing very serious

1  charges of which he may not have experienced before and the

2  evidence is overwhelming with respect to him.  We think it

3  poses a very -- a very significant risk of fleeing if he

4  faces new charges.

5          THE COURT:  Okay.  Do you have any -- you want to

6  offer anything else?

7          MR. SALINAS:  Briefly, Your Honor.  Again, Nelson

8  Ventura and his whole family have come here from

9  El Salvador.  Most of his family are United States citizens.

10 The brothers have set up businesses here in the United

11 States.  They pay their taxes.  None of them have ever been

12 in trouble before, with the exception of the case that

13 Mr. Nelson Ventura is charged on; he hasn't been in trouble

14 previously.

15         Again, his wife of 22 years and they have three

16 children that are United States citizens.  He did or does

17 have a problem with substance abuse.  I believe that the

18 Court could fashion something for him, even if he needed to

19 go into a drug program or report or whatever he needs to do

20 if he tested for drugs and the Court could make him wear an

21 ankle monitor or whatever.  He's not going to leave his

22 family here in the United States and his children.  And,

23 again, the only reason he did leave in 2004 was for a

24 grandfather who passed away in El Salvador.  So other than a

25 grandfather who passed away, he has nowhere to go.

1                    THE COURT:  Okay.  Anybody else?

2                    MR. FRIESELL:  Your Honor, I would just -- based

3    on the evidence that was presented in the case today, his

4    lack of criminal history, his youth and the fact that he --

5    his -- even assuming the facts are true, the level of his

6    participation, he is not a flight risk or danger to the

7    community.

8                    THE COURT:  Sure.  Ali, do you want to say

9    anything more?

10                   MR. FAZEL:  No, sir.

11                   THE COURT:  All right.

12                   All right.  I know you're not going to want to

13   hear this, but I'm going to, basically, take this under

14   advisement and take a look at all this.  I've got 30-pages

15   of notes to look at.

16                   Israel, can I keep that pinpoint thing down here

17   without destroying some chain of custody?

18                   MR. KHANDELWAL:  No, that's fine, Your Honor.

19   The only one I have, though, is on my computer.  I have a

20   disk with the actual agent marks, but those are the more

21   standard version.  I tried to trim it down.

22                   THE COURT:  Can you just print me out those

23   things that you showed from it?

24                   MR. KHANDELWAL:  I think I could if I could

25   access this printer.  I should be able to do it.

1        THE COURT:  Yeah?  Okay.  I don't know if we can

2   give you access before you leave here today, but I would

3   like to have them because I couldn't see them and if -- I

4   may or may not even look at them, but if I want to, with you

5   gone, I won't be able to but I will make a decision sometime

6   Monday.  I promise you that.  It's just that I've got some

7   stuff I want to look at.

8        Pretrial -- Ali, I'll check with pretrial to see

9   if they've got any different opinion based upon the

10  information you gave them.

11       MR. KHANDELWAL:  Thank you, Judge.

12       THE COURT:  They weren't here today.  So nothing

13  -- they didn't hear anything here today, but I just want to

14  take a look at this stuff.

15       So I'll let you know something on Monday, okay?

16       (Proceeding adjourned at 3:55 p.m.)

17                        * * * * *

18       *I certify that the foregoing is a correct*

19  *transcript to the best of my ability from the electronic*

20  *sound recording of the proceedings in the above-entitled*

21  *matter.*

22  */S/ MARY D. HENRY*

23  *CERTIFIED BY THE AMERICAN ASSOCIATION OF*
    *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**D-337*
24  *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*
    *JTT INVOICE #52781*
25  *DATE:  AUGUST 14, 2014*